**JENNER & BLOCK LLP**
Kenneth K. Lee (Cal. Bar No. 264296)
klee@jenner.com
633 West 5th Street, Suite 3600
Los Angeles, CA  90071-2054
Phone:      (213) 239-5100
Facsimile:  (213) 239-5199

**JENNER & BLOCK LLP**
Dean N. Panos (admitted *pro hac vice*)
dpanos@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Phone:      (312) 222-9350
Facsimile:  (312) 527-0484

Kelly M. Morrison (Cal. Bar No. 255513)*
kmorrison@jenner.com
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Phone:      (202) 639-6000
Facsimile:  (202) 639-6066

*Not admitted in Washington, D.C.;
practicing under the supervision of the
partnership of Jenner & Block LLP.

Attorneys for
Kraft Heinz Company

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| CLAUDIA MORALES and MOCHA GUNARATNA, each individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>    vs.<br><br>KRAFT FOODS GROUP, INC. and DOES 1 through 100, inclusive,<br><br>        Defendants. | Case No. 14-cv-04387-JAK-PJW<br><br>**NOTICE OF MOTION AND MOTION FOR DECERTIFICATION**<br><br>Redacted Version of Document Proposed to Be Filed Under Seal<br><br>Hearing Date:  March 27, 2017<br>Time: 8:30 a.m.<br>Courtroom: 10B<br>Judge:  Hon. John A. Kronstadt<br><br>Action removed: June 6, 2014 |

* * *

PLEASE TAKE NOTICE that, on March 27, 2017, at 8:30 a.m., or as soon thereafter as the Court is available, in Courtroom 10B of the federal courthouse located at 350 W. First Street, Los Angeles, CA 90012, Kraft Heinz Company will and does move for decertification under Federal Rule of Civil Procedure 23, on the grounds that (1) Plaintiffs have failed to satisfy their burden of offering a viable method of calculating classwide damages; (2) the subjectively-defined, fail-safe class is unmanageable; and (3) Plaintiff's counsel are not capable of adequately representing the interests of the entire class.

Kraft Heinz's motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently-filed Declaration of Kenneth K. Lee, and any additional evidence or briefing on this subject that may be requested by the Court or submitted under the rules.

Dated: February 15, 2017                    JENNER & BLOCK LLP

                                             /s Kenneth K. Lee_____
                                            By: Kenneth K. Lee

                                            Attorneys for
                                            Kraft Heinz Company

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND..............................................................................3

    I.  Plaintiffs Allege That Kraft Heinz Deceived Consumers Into Believing "Natural Cheese" Contains Only Natural Ingredients............................3

    II.  ███████████████████████████████████████████ ...........3

    III.  Annatto Extract and Titanium Dioxide Are Naturally Sourced Ingredients .............................................................................................5

LEGAL STANDARD...........................................................................................6

ARGUMENT ........................................................................................................7

    I.  Plaintiffs Have Failed to Offer a Valid Method for Calculating Classwide Damages as Required by *Comcast v. Behrend* .....................7

        A.  Plaintiffs have failed to proffer evidence of classwide damages....8

        B.  Dr. Bodapati's "willingness-to-pay" conjoint analysis is not consistent with Plaintiffs' liability theory ................................8

        C.  Dr. Bodapati's "damages" model suffers from other fatal flaws ..13

    II.  Plaintiffs Have Failed To Satisfy the Superiority Prong of Rule 23 Because the Proposed Class Is Unmanageable. ...................................14

        A.  Plaintiffs have failed to identify an objective method to determine class membership.......................................................15

        B.  The class is an unmanageable fail-safe class ..............................20

        C.  The class violates Kraft's due process rights ..............................21

    III.  The Class Should Be Decertified Because Class Counsel Are Inadequate ..........................................................................................22

CONCLUSION...................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C**ASES**

*Apple, Inc. v. Samsung Elecs. Co.*,
   No. 11-01846, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ................................... 11

*Brazil v. Dell Inc.*,
   585 F. Supp. 2d 1158 (N.D. Cal. 2008) ................................................................. 21

*Brazil v. Dole Packaged Foods, LLC*,
   660 F. App'x 531 (9th Cir. Sep. 30, 2016) ........................................................ 9, 21

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ........................................................................ 15, 21

*Buckland v. Maxim Healthcare Servs., Inc.*,
   No. 11-8414, 2012 WL 3705263 (C.D. Cal. Aug. 27, 2012) ................................ 23

*Comcast v. Behrend*,
   133 S. Ct. 1426 (2013)................................................................................... 1, 7, 8

*Gannon v. Network Tel. Servs., Inc.*,
   No. 12-9777, 2013 WL 2450199 (C.D. Cal. June 5, 2013) ............................. 17, 19

*Gomez v. St. Vincent Health, Inc.*,
   649 F.3d 583 (7th Cir. 2011), *as modified* (Sept. 22, 2011) ................................. 23

*Harris v. General Development Corp.*,
   127 F.R.D. 655 (N.D. Ill. 1989) ........................................................................... 16

*Hughes v. The Ester C Co.*,
   317 F.R.D. 333 (E.D.N.Y. 2016)........................................................................... 12

*In Alliance to End Repression v. Rochford*,
   565 F.2d 975 (7th Cir. 1977) ............................................................................... 16

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015)................................................................. 11

*In re NJOY, Inc. Consumer Class Action Litig.*,
   No. 14-428, 2016 WL 787415 (C.D. Cal. Feb. 2, 2016)............................. 9, 11, 12

iii

*In re POM Wonderful LLC*,
No. 10-02199, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................................ 8

*Kamar v. RadioShack Corp.*,
375 F. App'x 734 (9th Cir. 2010) ........................................................................... 20

*Kandel v. Brother Int'l Corp.*,
264 F.R.D. 630 (C.D. Cal. 2010) ............................................................................ 25

*Kaur v. Things Remembered, Inc.*,
No. 14-5544, ECF No. 61 (N.D. Cal. Apr. 20, 2016) ............................................ 23

*Kingsbury v. U.S. Greenfiber, LLC*,
No. 08-00151, 2013 WL 12114077 (C.D. Cal. Nov. 5, 2013) ................................ 8

*Lambert v. Nutraceutical Corp.*,
No. 13-05942, 2015 WL 12655388 (C.D. Cal. Feb. 20, 2015) ............................... 8

*Lanovaz v. Twinings N. Am., Inc.*,
No. 12-02646, 2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) ................................ 8

*Marlo v. United Parcel Serv., Inc.*,
639 F.3d 942 (9th Cir. 2011) ................................................................................... 6

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) .................................................................................. 12

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ........................................................................... 16, 17

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates, Inc.*,
No. 12-01685, 2016 WL 2610107 (S.D. Cal. May 6, 2016) ................................ 6, 7

*Niemeyer v. Williams*,
910 F. Supp. 2d 1116 (C.D. Ill. 2012) .............................................................. 23, 24

*Ratnayake v. Farmers Ins. Exch.*,
No. 11-1668, 2015 WL 875432 (D. Nev. Feb. 27, 2015) ...................................... 20

*Rattray v. Woodbury Cnty., IA*,
614 F.3d 831 (8th Cir. 2010) ................................................................................. 22

*Ries v. Arizona Beverages USA LLC*,
No. 10-1139, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ........................... 22, 23

*Rikos v. Procter & Gamble Co.*,
   799 F.3d 497 (6th Cir. 2015) ................................................................. 16

*Rockwell v. Chase Bank USA, N.A.*,
   No. 10-1602, 2012 WL 4846177 (D. Wash. Oct. 11, 2012) ................................. 20

*Rodriguez v. Gates*,
   No. 99-13190, 2002 WL 1162675 (C.D. Cal. May 30, 2002) ............................... 21

*Saavedra v. Eli Lilly & Co.*,
   No. 12-9366, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ......................... 11, 12

*Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*,
   821 F.3d 992 (8th Cir. 2016) ................................................................. 16

*Simer v. Rios*,
   661 F.2d 655 (7th Cir. 1981) ................................................................. 16

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ....................................................... 14, 15, 22

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ............................................................... 19

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. &
   Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010) ............................................................. 6, 17

*Wang v. Chinese Daily News, Inc.*,
   737 F.3d 538 (9th Cir. 2013) ................................................................... 6

*Weiner v. Snapple Beverage Corp.*,
   No. 07-8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ................................... 10

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-2724, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) .............................. 6, 8

*Williams v. Oberon Media, Inc.*,
   No. 09-8764, 2010 WL 8453723 (C.D. Cal. Apr. 19, 2010) ................................ 15

**OTHER AUTHORITIES**

21 C.F.R. § 73.30(a) ................................................................... 5, 20

Fed. R. Civ. P. 23 ................................................................... passim

# INTRODUCTION

In June 2015, this Court certified a class of "[a]ll persons who, between May 7, 2010 through the present, purchased [Kraft Natural Cheese Fat Free Shredded Cheddar] in the State of California for personal use and not for resale *and who did so because the Product was described as 'natural cheese,' which meant that it contained no artificial ingredients.*"  ECF No. 78 at 15 (emphasis added).  The Court, however, recognized that ongoing discovery may impact the propriety of certification, and acknowledged that the class was "subject to possible decertification."  *Id.* at 9.

The Court's observation of a "possible decertification" has proven prescient. Now that fact and expert discovery have closed, it has become clear that the class must be decertified because this case cannot be tried on a class basis.  Several courts have denied certification or decertified a class under very similar circumstances.

<u>First</u>, Plaintiffs' expert, Dr. Anand Bodapati, has failed to offer a damages model that calculates classwide damages "consistent with [Plaintiffs] liability case," as required by the Supreme Court's *Comcast v. Behrend* decision.  Plaintiffs' theory of the case is that Kraft Heinz's use of the term "natural cheese" deceived consumers, and that it charged a "price premium" over comparable cheese products that did not use that term.

But at his deposition, Dr. Bodapati — Plaintiffs' *damages* expert — admitted that he "was not… charged with" the "question of damages."  Rather, he said that he used a conjoint analysis survey to merely examine how much a consumer would hypothetically be willing to pay for the term "natural cheese."  But Economics 101 teaches us that a product's price is set by both demand (*i.e.*, a consumer's "willingness-to-pay") *and* supply (*e.g.*, a company's pricing strategy).  Dr. Bodapati, however, admitted that he only examined the demand-side, and did not consider supply-side factors that affect pricing.  As a result, Dr. Bodapati did not measure the alleged "price premium" that Kraft Heinz charged or the actual damages supposedly suffered by consumers.  Instead, he measured consumers' subjective willingness to

pay, an academic and irrelevant exercise that is not consistent with Plaintiffs' theory of liability.  Numerous courts have similarly rejected conjoint analysis damages model for this very reason, ruling that it does not measure the alleged real-life price premium but rather a hypothetical "willingness-to-pay" by consumers.

Even setting aside that Dr. Bodapati's willingness-to-pay conjoint analysis does not measure price premium damages, his report suffers numerous other flaws, as detailed in the rebuttal report of Michael Emmert of Navigant Consulting. For example, Dr. Bodapati does not attempt to measure historical damages that the class allegedly suffered over the past six years because he does not examine real-life marketplace pricing data for cheese.  Instead, he relies on a conjoint analysis survey conducted in April 2016, which does not take into account the historical price variations across the six-year period.   These errors further underscore that Dr. Bodapati's "willingness-to-pay" analysis is not consistent with Plaintiffs' theory of liability.

<u>Second</u>, despite the completion of discovery and the passage of many months, Plaintiffs have failed to establish the manageability of the class. Because the class includes only people who bought the cheese "*because* the Product was described as 'natural cheese,'" this Court would have to probe each prospective class member's subjective views to find the proverbial needle-in-the-haystack consumers. This analysis would be further complicated because the Court would then have to determine for each putative class member whether he or she interpreted "natural cheese" as meaning the cheese contained "no artificial ingredients" (and whether he or she considered annatto and titanium dioxide to be "artificial") in light of the class definition hinging on each consumer's interpretation of the phrase.  Further, the class is an impermissible fail-safe class.

<u>Third</u>, current class counsel, The Clarkson Law Firm, does not meet the adequacy requirement under Rule 23.  When it was certified in June 2015, the class was represented by two firms, Milstein Adelman and the Clarkson Law Firm.  In

seeking class certification, Plaintiffs cited only Milstein Adelman's "significant experience in prosecuting large consumer fraud class actions." ECF No. 47-1 at 14 & n.3; ECF No. 47-2 (Declaration of Paul Stevens describing the qualifications, accomplishments, and capabilities of Mr. Stevens and the Milstein Adelman firm). Milstein Adelman, however, has withdrawn as class counsel. And since its withdrawal, the remaining counsel has struggled to adequately represent the class, including by failing to timely serve expert and rebuttal reports and proffering a damages expert report that is so clearly deficient and inadmissible.

## FACTUAL BACKGROUND

## I. Plaintiffs Allege That Kraft Heinz Deceived Consumers Into Believing "Natural Cheese" Contains Only Natural Ingredients.

Plaintiffs' theory of the case is that "Defendants' labeling and claims about the Product as 'natural cheese' lead people to believe that the Product is indeed 'natural.' This means therefore that the public is led to believe the Product, at a minimum, has no *artificial* ingredients or characteristics." Second Amended Complaint (SAC) ¶ 40 (emphasis in original). *See also* SAC ¶ 39, 42. Plaintiffs accordingly seek damages in the form of a "price premium" theory. *See, e.g.,* ECF No. 60 at 9 (Plaintiffs' class cert reply brief) ("Plaintiffs' theory of liability rests on the claim that, due to the inclusion of artificial color, an unnatural ingredient, in the Product, the Product's true value or market price is a figure lower than the purchase price of roughly $4.").

## II. ███████████████████████████████████████████████████████████

Although Plaintiffs assert that they personally bought Kraft Fat Free Shredded Cheddar because of the "Natural Cheese" statement, Kraft Heinz's confidential documents reveal that ████████████████████████████████.

Kraft Heinz's internal research suggests that ████████████████████████ ████████████████████████████████████████████:

- ███████████████████████████████████████████████████ ████████████████████████. Ex. 19 at 275.

- ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████. Ex. 20 at 352; Ex. 19 at 282, 340; *see also* Ex. 8 at 16:12-16, 46:9-48:10, 72:17-23; Ex. 9 at 23:20-25:24, 39:24-40:4 (Plaintiffs acknowledging that a key reason they purchased Fat Free Shredded Cheddar was its lack of fat, and they could not recall another fat free cheddar brand).

- As Kraft's marketing director testified, ███████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ Ex. 10 at 155:7-156:9, 158:9-15, 159:2-12, 160:2-17.

- ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████ Ex. 21 at 380. This confirms that the Kraft Fat-Free variety ████ ██████████████████████████████████████

In fact, according to Kraft Heinz's internal business analysis, ██████████████ ███████████████████████████████████████████████████ ████ Ex. 18 at 169-70 (citing ███████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████ ██████████████████████████████████ by a consumer survey conducted by Dr. Itamar Simonson, the Sebastian S. Kresge Chair of Marketing at Stanford's Graduate School of Business and one of the world's leading marketing scholars.  After conducting an open-ended survey of over 400 Kraft consumers, he

4

found that "[t]he appearance of the word 'Natural' (i.e., 'Natural Cheese') on the package does not affect purchase likelihood" or impact the price consumers are willing to pay. Ex. 4 ¶¶ 14, 34, 36. In fact, only *one* of the 410 survey respondents indicated they bought the cheese because it is "natural." *Id.* ¶ 32. Instead, consumers purchase Kraft Fat Free Shredded Cheddar for a variety of reasons, including "brand familiarity, cost, packaging, and uses of the cheese." *Id.* ¶¶ 32, 33 (41% of respondents indicated that the Kraft brand impacted their decision to purchase the product). Respondents also indicated that the product's "fat free" content impacted their intent to buy. *Id.* ¶ 35; *id.*, Ex. F at 75 (20% of respondents listing "fat content" as a reason they would buy the product"). In short, "(a) there are large differences across shredded cheese buyers in terms of the factors they consider important and (b) 'natural' cheese is not an important purchase consideration." *Id.* ¶ 33. Notably, Plaintiffs did not proffer a marketing expert to rebut Dr. Simonson's analysis.

### III.   **Annatto Extract and Titanium Dioxide Are Naturally Sourced Ingredients.**

Substantial evidence before the Court shows that Kraft Fat Free Shredded Cheddar contains two naturally sourced ingredients — annatto extract and titanium dioxide — that are described as "artificial coloring" in the ingredient list only because the FDA's technical regulations require anything that imparts color, even natural substances, to be described as such (Ex. 11 at 30:3-15):

- The FDA recognizes that "[t]he color additive annatto extract is an extract prepared from annatto seed." 21 C.F.R. § 73.30(a).

- Kraft Heinz's senior group leader of research and development Danielle Weiss testified that (1) "[f]rom a scientific point of view, the product contains colors that are naturally derived"; (2) neither annatto nor titanium dioxide are "artificial color"; and (3) "Annatto is derived from a seed base. Titanium dioxide is a mineral; both naturally occurring." Ex. 11 at 29:24-30:1, 30:12-21, 63:2-6, 36:18-19.

- Kraft Heinz's expert Dr. Kantha Shelke, a food scientist who has taught at

1  Johns Hopkins, opined that "titanium dioxide exists in nature and/or is also
2  derived from minerals for applications in the food industry," and "there are no
3  chemical differences between titanium dioxide derived directly from minerals
4  or titanium dioxide that is the product of chemical separation/extraction steps
5  used to make a material that is of suitable purity for the purposes of coloring
6  cheese." Ex. 3 ¶ 11.

7  Again, Plaintiffs did not proffer any witness to rebut any of this evidence.

8  ## LEGAL STANDARD

9  "[A] district court retains the flexibility to address problems with a certified
10 class as they arise, including the ability to decertify." *United Steel, Paper & Forestry,*
11 *Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v.*
12 *ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010); *Wang v. Chinese Daily News,*
13 *Inc.*, 737 F.3d 538, 546 (9th Cir. 2013) ("Rule 23 provides district courts with broad
14 authority at various stages in the litigation to revisit class certification
15 determinations").

16 The standard for decertification is the same as for class certification:   The
17 plaintiff bears the burden of demonstrating that all of the requirements of Rule 23 are
18 satisfied.   *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011);
19 *Werdebaugh v. Blue Diamond Growers*, No. 12-2724, 2014 WL 7148923, at *4 (N.D.
20 Cal. Dec. 15, 2014).   "[T]he court *must* decertify a class if the requirements for class
21 certification under Rule 23 are not met."   *NEI Contracting & Eng'g, Inc. v. Hanson*
22 *Aggregates, Inc.*, No. 12-01685, 2016 WL 2610107, at *6 (S.D. Cal. May 6, 2016).
23 As the *NEI Contracting* court explained, "[u]nder Rule 23 the district court is charged
24 with the duty of monitoring its class decisions in light of the evidentiary development
25 of the case.   The district judge must define, redefine, subclass, and decertify as
26 appropriate in response to the progression of the case from assertion to facts."   *Id.*
27 (internal quotation and citation omitted).

28

## ARGUMENT

### I.    Plaintiffs Have Failed to Offer a Valid Method for Calculating Classwide Damages as Required by *Comcast v. Behrend.*

The Supreme Court held in *Comcast v. Behrend* that a plaintiff bears the burden of "establishing" "through evidentiary proof" "that damages are capable of measurement on a classwide basis." 133 S. Ct. 1426, 1432-33 (2013). Specifically, courts "must conduct a 'rigorous analysis' to determine whether" a plaintiff's proposed damages model (1) is "consistent with its liability case," such that it "measure[s] only those damages attributable to that theory," and (2) will permit "measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 1429, 1433. If a plaintiff fails to meet this burden, she "cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* at 1433.

In granting certification, this Court recognized that Plaintiffs "ha[d] not completed the damages calculations," but accepted Dr. Bodapati's representation that he would be able to calculate classwide damages based on a future study he planned to conduct. ECF No. 78 at 12. The Court, however, expressly recognized that because Dr. Bodapati had not yet performed the proposed damages analysis and discovery was ongoing, the class may be "subject to possible decertification after the close of discovery." *Id.* at 9. Now that discovery has closed and Dr. Bodapati has completed his analysis, it is clear that Plaintiffs' class must be decertified because (1) Plaintiffs' damages model is inadmissible under *Daubert*; and (2) irrespective of its admissibility, Plaintiffs' damages model fails to calculate "only those damages attributable" to Plaintiffs' theory of liability. *Comcast*, 133 S. Ct. at 1429.

**A. Plaintiffs have failed to proffer evidence of classwide damages.**

Decertification must be granted when a plaintiff fails to establish that "damages are capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1432-33.[1] Here, Plaintiffs rely exclusively on Dr. Bodapati's conjoint analysis to establish classwide damages. *See* ECF No. 152 at 4. (Plaintiffs conceding that, "if [Dr. Bodapati's] Expert Report is stricken, it would extinguish Plaintiffs' ability to obtain class-wide damages"). For the reasons described in Kraft's concurrently-filed *Daubert* motion, however, Dr. Bodapati's analysis does not come anywhere close to meeting *Daubert*'s reliability standard, suffers from fatal flaws, and does not even attempt to measure damages. If Kraft's *Daubert* motion is granted, the class must be decertified as a result.

**B. Dr. Bodapati's "willingness-to-pay" conjoint analysis is not consistent with Plaintiffs' liability theory.**

Another reason to decertify the class is that Dr. Bodapati's "willingness-to-pay" conjoint analysis does nothing to measure the "damages attributable to [Plaintiffs'] theory [of liability]," as required by *Comcast*. 133 S. Ct. at 1429; *see also Werdebaugh*, 2014 WL 7148923, at *14-*15 (decertifying class where plaintiff "represent[ed] that he would put forth evidence of damages limited to the injuries allegedly caused by Defendant's use of 'evaporated cane juice' and/or 'All Natural' on its product labels," but "failed to do so"); *In re POM Wonderful LLC*, No. 10-02199, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (decertifying class because

---

[1] *See also Kingsbury v. U.S. Greenfiber, LLC*, No. 08-00151, 2013 WL 12114077, at *4 (C.D. Cal. Nov. 5, 2013) (decertifying class because "[i]t is [plaintiff's] burden to provide a model capable of measuring restitution on a classwide basis, and he has not done so"); *Lambert v. Nutraceutical Corp.*, No. 13-05942, 2015 WL 12655388, at *6 (C.D. Cal. Feb. 20, 2015), *reconsideration denied*, 2015 WL 12655392 (C.D. Cal. June 24, 2015) ("Plaintiff failed to provide the key evidence necessary to apply his classwide model for damages"); *Lanovaz v. Twinings N. Am., Inc.*, No. 12-02646, 2014 WL 1652338, at *7 (N.D. Cal. Apr. 24, 2014) (because "plaintiffs do not present any damages model capable of estimating the price premium attributable to Twinings' antioxidant labels, . . . plaintiff has failed to satisfy the requirements for class certification under Comcast").

plaintiffs' "damages 'model' does not comport with *Comcast*'s requirement that class-wide damages be tied to a legal theory").

As Plaintiffs put it, their "theory of liability rests on the claim that, due to the inclusion of artificial color, an unnatural ingredient, in the Product, the Product's true value or market price is a figure lower than the purchase price of roughly $4." ECF No. 60 at 9. In other words, Plaintiffs are pursuing a "price premium" theory of damages that the Ninth Circuit has held is the only proper damages model in false advertising case. *See Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534-35 (9th Cir. Sep. 30, 2016) (ruling that damages is limited to "the difference between the prices customers paid and the value of the fruit they bought—in other words, the "price premium" attributable to Dole's 'All Natural Fruit' labels.").

Under the price premium theory of damages, "[t]he proper measure of damages in this case is 'the difference between the market price actually paid by consumers [for Kraft Fat Free Shredded Cheddar] and the true market price that reflects the impact of the ["natural cheese" label].'" *In re NJOY, Inc. Consumer Class Action Litig.*, No. 14-428, 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016); *see* ECF No. 78 at 12 (Court's order describing Plaintiffs' theory that "each class member paid more for the Product because the term 'natural cheese' was used to describe it"); ECF No. 60 at 9 (Plaintiffs claiming that Dr. Bodapati will be able to "quantify the incremental *market value* of advertising the Product as 'natural cheese'" (emphasis added)).

To satisfy *Comcast*, Plaintiffs must therefore present a damages model capable of calculating the price premium allegedly attributable to the "natural cheese" label. Plaintiffs have failed to do so. In fact, Dr. Bodapati admitted at deposition that he *did not even attempt to measure damages:* He "was *not* . . . charged with" the "question of damages," which he views as "a litigation issue," but only with "determining what additional increment a person is *willing to pay* for that label." Ex. 12 at 162:9-163:5, 165:11-18 (emphasis added); *see also id*. at 199:15-17 (emphasis added) (Dr. Bodapati explaining that the "purpose of this study is on evaluating the value [of the

label] *to the consumer*"). That admission alone merits decertification because Plaintiffs' *damages* expert has conceded that he did not try to calculate damages or the "price premium" that Kraft Heinz allegedly charges for the term "natural cheese."

Instead of measuring the difference between the *market price* with and without the "natural cheese" label, Dr. Bodapati used a conjoint analysis to measure consumers' *subjective willingness to pay* for the "natural cheese" label. But that willingness-to-pay (*i.e.*, demand) is only *one* component of a product's price. Basic economics dictates that a product's price is set by the law of supply *and* demand. As Dr. Ronald Wilcox of the University of Virginia's Darden School of Business explained in his report, "[t]he average willingness-to-pay does not represent the price premium Kraft could have charged for [the 'natural cheese'] attribute in a competitive market because "[f]irms generally do not charge their potential customers based on the average willingness-to-pay when setting prices" and it "ignores competitive market factors that influence [both] the price of the product and consumers' willingness to pay for the attribute." Ex. 7 ¶¶ 25-29. Indeed, Dr. Bodapati himself admitted that a product's price is determined by many supply-side factors. He acknowledged that "in determining a price of a product in real life, you have to consider both the demand, the consumer's preferences, and the firm's pricing strategy." Ex. 12 at 200:14-22 (emphasis added); *see also id*. at 71:10-12, 74:4-5, 165:11-18, 196:9-19 ("pricing involves multiple considerations beyond customer preference," including supply-side factors like "profit maximization and competition"). Thus, because his "conjoint analysis only looked at the demand side," Dr. Bodapati admitted that it "does not speak to" price setting. *Id*. at 71:13-14, 202:14-18.[2]

---

[2] As explained in Kraft Heinz's *Daubert* motion, Kraft Heinz's "pricing strategy" does not include charging a premium for the words "natural cheese." The undisputed evidence shows that Kraft has a line of non-Natural Cheese that is priced the *same* as its Natural Cheese line. See Declaration of Christina Aryafar ¶¶ 5-7 & Exs. A, B. Thus, as in *Weiner v. Snapple Beverage Corp.*, this real life pricing data significantly undermines any speculation of a "price premium" caused by the "natural cheese" label. No. 07-8742, 2010 WL 3119452, at *1 & n.19 (S.D.N.Y. Aug. 5, 2010) (noting that

(Continued...)

In other words — as other courts have found in rejecting conjoint analysis for purposes of determining price premium — Dr. Bodapati has "measure[d] the market demand for [the 'natural cheese' label] *in a vacuum*, without relation to the actual price or value" of the product at issue, even though "the ultimate price of a product is a *combination* of market demand and market supply." *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-01846, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014) (emphasis added) (rejecting the use of conjoint analysis to show that a particular feature increased the price of tablets and smartphones); *see also Saavedra v. Eli Lilly & Co.*, No. 12-9366, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014),("consumer value is a subjective concept distinct from the fair market value concept commonly used when calculating benefit-of-the-bargain damages").

Several courts have rejected conjoint analyses under *Comcast* for this very reason. In *NJOY*, for example, Judge Morrow found that the plaintiffs' proffered conjoint analysis model "d[id] not satisfy *Comcast*" because it failed to quantify the "price premium" plaintiffs paid as a result of allegedly misleading advertising for e-cigarettes. 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015). The court rejected conjoint analysis as "provid[ing] only a model for testing what a consumer is willing to pay, without considering other factors in a functioning marketplace." *Id.* The court explained further:

> A consumer's subjective valuation of the purported safety message, measured by their relative willingness to pay for products with or without the message, is not an accurate indicator of restitutionary damages, because it does not permit the court to calculate the *true market price* of NJOY e-cigarettes absent the purported misrepresentations. Plaintiffs' damages methodology is therefore deficient under *Comcast*."

*Id.* at 1122 (emphasis in original). Judge Walter (who was assigned the *NJOY* case

---

evidence that Snapple sold its "All Natural" beverages at the "same wholesale list price" as those without a "natural" label undermined expert's speculation of a "price premium").

after Judge Morrow retired) later rejected the plaintiffs' motion for reconsideration, holding that a "modified" analysis that sought to "tether the results to a functioning market" by using actual market prices in the survey remained flawed because it "still only look[ed] to the demand side of the market equation, and ignore[d] the price at which NJOY, and other e-cigarette manufacturers, would be willing to sell their products." 2016 WL 787415, at *7 (internal quotation marks and citation omitted).

Similarly, in *Saavedra*, Judge Wilson rejected a conjoint analysis model purporting to quantify the value that consumers placed on an alleged misrepresentation regarding risks associated with Cymbalta. As the court explained:

> By looking only to consumer demand while ignoring supply, [conjoint analysis] converts the lost-expectation theory from an objective evaluation of relative fair market value to a seemingly subjective inquiry of what an average consumer wants." 2014 WL 7338930, at *5.

In denying class certification as a result of the flawed damages model, the court noted that it had "found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell). *Id.*[3]; *see also Hughes v. The Ester C Co.*, 317 F.R.D. 333, 354-56 (E.D.N.Y. 2016) (holding that plaintiffs "seeking damages based on a price premium theory" failed to satisfy *Comcast* when they proffered a conjoint analysis model to calculate class-wide damages).

In short, "willingness to pay" is not a proxy for price premium and cannot be used to ascertain classwide damages in this case. Indeed, even the firm that sells Sawtooth — the "leading" software that Dr. Bodapati recommends for conjoint

---

[3] *See also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 229 (2d Cir. 2008) (citation omitted) (describing as "pure speculation" a similar "loss of value theory" based on a survey that asked "respondents to 'make binary comparisons between a 'genuine' light cigarette . . . and a 'misrepresented' light cigarette that was no less harmful than conventional cigarettes"), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).

analysis (Ex. 12 at 47:15-24, 183:23-184:3) — specifically cautions against using conjoint analysis for calculating the monetary value of an attribute "because competitive factors are not addressed." Ex. 7 ¶ 34.[4]

### C. Dr. Bodapati's "damages" model suffers from other fatal flaws.

Even setting aside that Dr. Bodapati did not even try to measure damages, his expert report has other major defects that confirm that Plaintiffs' so-called "damages" theory is not consistent with their theory of liability. As detailed in the rebuttal report of Navigant's Michael Emmert, Dr. Bodapati's report suffers from severe problems:

- It does not measure historical damages: Even though Plaintiffs seek damages over a six-year period, Dr. Bodapati calculates a compensation amount that is based on prices at a single moment in time in April 2016. Ex. 6 ¶ 39. Dr. Bodapati has not provided any evidence or explanation of how his "compensation amount" takes into account the varying prices over that six-year period. He inexplicably refused to consider real-life marketplace pricing and sales data for shredded cheese that would have allowed him to assess the historical pricing. *See* Daubert Mot. at 24-25.

- His compensation amount is skewed by several unreasonable outliers: Dr. Bodapati arrived at his $0.747 compensation amount by calculating a simple average of the 464 responses. But over a third of the respondents' "willingness-to-pay" was 10 cents or lower. Ex. 6 ¶ 75. But 32 respondents

---

[4] Dr. Bodapati's report simply serves to highlight that individual issues overwhelm common questions related to classwide damages. First, Dr. Bodapati's "willingness-to-pay" is a completely subjective valuation that varies from consumer to consumer. Ex. 12 at 199:15-17 (the "purpose of this study is on evaluating the value [of the label] to the consumer"). Second, his decision to extrapolate the $0.747 figure from "a calculation of the simple average of" respondents' widely divergent valuations results in an alleged classwide "compensation amount" that captures the valuations of only 12 of the 464 survey respondents, or less than 3%. *See* Ex. 6 ¶¶ 72-80. In contrast, the "largest proportion" of individual responses — 33.4% — are clustered around the $0 to $.10 valuation range, and a greater number of respondents (75) associated a *negative* valuation with the "natural cheese" label. *Id.* ¶¶ 74-75, Chart 1.

claimed that they were willing to pay $2.99 or more just for the term "natural cheese," which is facially absurd because an average bag of shredded cheese is around $3 or so. *See id.* ¶ 78. As Mr. Emmert explains, these outlier "individual compensation amounts are unreliable because they either exceed or represent the entire price of the Product." *Id.* Yet because Dr. Bodapati did not do a "reasonableness check" of his results, those outlier responses skewed the average "compensation amount."

- <u>Dr. Bodapati selectively excluded certain responses to skew the results:</u> Dr. Bodapati admitted that some respondents actually said that they would pay more to buy a product that did *not* have the term "natural cheese." So some respondents, for example, gave a negative compensation amount of -$1.00 (*i.e.*, they would pay an extra dollar to buy a non-"Natural Cheese). Ex. 6 ¶¶ 68-71. Yet Dr. Bodapati, without any explanation, excluded these responses because presumably these figures would have reduced the $0.747 average compensation amount.

## II.   Plaintiffs Have Failed To Satisfy the Superiority Prong of Rule 23 Because the Proposed Class Is Unmanageable.

At the hearing for summary judgment, this Court presciently foresaw potential manageability problems and asked Plaintiffs' counsel, "How are you going to ascertain who [the class members] are?" Ex. 17 at 21:11-16. Plaintiffs provided no response.

This Court's concerns are well-founded. "[A] class action filed under Fed. R. Civ. P. 23(b)(3) must be 'superior to other available methods' of adjudication in light of any 'difficulties likely to be encountered in the management of a class action.'" *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990) (citing Fed. R. Civ. P. 23(b)(3)). "This 'manageability' requirement includes consideration of the potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages." *Id.*

Here, Plaintiffs' class is limited to consumers who purchased Kraft Fat Free Shredded Cheddar "*because* [it] was described as 'natural cheese,' which meant that it contained no artificial ingredients."  ECF No. 78 at 15 (emphasis added).  In other words, the class is limited to "those consumers that were misled by Kraft's use of the term 'natural cheese,' and made purchasing decisions due to that deception and not for other reasons."  *Id.*  Class membership is therefore conditioned on consumers' *subjective reasons* for purchasing Kraft Fat Free Shredded Cheddar, *and* a determination that they were indeed misled.  Thus, the class fails both because identification of class members is an individualized and unmanageable task, and because it is an improper fail-safe class whose members are identifiable only after a finding of liability.

### A. Plaintiffs have failed to identify an objective method to determine class membership.

Although the Ninth Circuit held in *Briseno v. ConAgra Foods, Inc.* that "the language of Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification," the court endorsed "the principle that a class definition must be *objective* and definite" for it to be "manageable" under Rule 23. 844 F.3d 1121, 1126, n.6 (9th Cir. 2017) (emphasis added).  In that case, the class was manageable because "at the certification stage, it was sufficient that the class was defined by an *objective criterion*: whether class members purchased Wesson oil during the class period." *Id.*, at 1124 (emphasis added)). *See also Williams v. Oberon Media, Inc.*, No. 09-8764, 2010 WL 8453723, at *3-4 (C.D. Cal. Apr. 19, 2010), *aff'd* 468 F. App'x 768 (9th Cir. 2012) (denying certification of classes of GameSaver members who were "unable to or had difficulty redeeming games" or "were signed up as a GameSaver Member due to an Oberon system error" because determining membership would require the court to "rely on the subjective statements of each individual consumer" as to their experiences and intent).

---

Numerous courts that have rejected a freestanding "ascertainability" requirement under Rule 23 have simultaneously recognized that *subjective* inquiries into class membership are inherently problematic, and have found certification inappropriate where "membership in the class [i]s contingent on the state of mind of the prospective class member." *In Alliance to End Repression v. Rochford*, 565 F.2d 975, 978 (7th Cir. 1977); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161 (2016) ("[C]lasses that are defined by subjective criteria, such as by a person's state of mind, fail the objectivity requirement."); *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 996-98 (8th Cir. 2016) (finding class certification appropriate when the class was defined by reference to "objective indicator[s]"); *Rikos v. Procter & Gamble Co*., 799 F.3d 497, 526 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1493 (2016) (internal quotation marks and citation omitted) (upholding class certification because "the proposed class [was] defined by objective criteria" and noting that "[f]or a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria").[5]

An instructive case is *Harris v. General Development Corp.*, where the plaintiffs sought to certify a class of "all black persons who were discouraged or excluded from applying for full time or part-time sales jobs at General Development Corporation . . . as a result of defendants' job recruiting, marketing or advertising policies." 127 F.R.D. 655, 657-58 (N.D. Ill. 1989). The court rejected the class because membership was dependent "on an individual's state of mind." *Id.* at 659. The court held that "[a]n attempt to identify those persons who were subjectively deterred would be a daunting and seemingly fruitless task, requiring an individual adjudication with respect to each potential class member." *Id.*

---

[5] *See also Simer v. Rios*, 661 F.2d 655, 669-71 (7th Cir. 1981) (rejecting class defined to include those who were "discouraged" from applying for assistance).

Similarly here, identifying consumers who purchased Kraft Fat Free Shredded Cheddar *because of* the "natural cheese" label, or who harbored a subjective belief that "natural cheese" meant "no artificial ingredients," would require "an individual adjudication with respect to each potential class member." *Id.*

The Ninth Circuit recently affirmed denial of class certification where the administrative difficulties inherent in identifying class members rendered the class unmanageable. *See Gannon v. Network Tel. Servs., Inc*., No. 12-9777, 2013 WL 2450199 (C.D. Cal. June 5, 2013), *aff'd*, 628 F. App'x 551 (9th Cir. 2016). In *Gannon*, the plaintiff brought a putative class action under the Telephone Consumer Protection Act and sought to certify a class consisting of "[a]ll persons in the United States and its Territories who received one or more *unauthorized* text messages sent by or on behalf of Defendants." *Id.* at *2. Because the defendants "provide[d] evidence that some of the recipients may have consented" to receipt of such messages, the court concluded that "Plaintiff's proposed class is unascertainable and unidentifiable. The Court cannot determine whether an individual is part of the class without extensive individual inquiry into the merits of Plaintiff's claim, which ultimately makes identification of the class administratively unfeasible." *Id.* In affirming the district court's decision, the Ninth Circuit agreed that certification was inappropriate because "it would be extremely difficult to ascertain the identities of the individuals who had not consented to receive the messages." 628 F. App'x at 552.

Here, the class definition includes only that subset of Kraft Fat Free Shredded Cheddar consumers who purchased the product *because of* the "natural cheese" label. Further, like the *Gannon* defendants, Kraft Heinz has presented unrebutted evidence that █████████████████████████████████████████████████████ ████████████████████████████████████████:

- Kraft Heinz's internal research suggests that ████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████



Ex. 19 at 275. *Id.* Ex. 20 at 352.

- Kraft's confidential documents show that ████████████████ ████████████████ ████████████████ ████████████████ ████████████████ Ex. 18 at 169-70.  Notably, ████████████████ ████████ *See id.*

- Dr. Itamar Simonson — one of the giants in the consumer marketing field and an endowed professor at Stanford — conducted a survey of over 400 consumers, and asked them to list various reasons why they bought Kraft Natural Cheese.  The survey revealed that consumers bought the product for a wide variety of reasons that have nothing to do with "natural cheese."  In fact, only *one* of the 410 respondents indicated that they bought the cheese because it is "natural."  Ex. 4 ¶ 32.

In their summary judgment reply brief, Plaintiffs attempt to address these problematic facts by asserting that "409 of the 410 survey respondents are not even members of the Class."  ECF No. 164-1 at 10. This admission confirms the difficulty involved in accurately identifying *one* class member from a group of 410 Kraft consumers. Similarly, Plaintiffs' own expert, Dr. Bodapati, admitted that his survey pool of 464 respondents may not include a single purchaser of Kraft Fat Free Shredded Cheddar.  That is not surprising, given that only 5.3% of households who buy Kraft's Natural Cheese purchase the Fat-Free variety.  Ex. 21 at 380.  Put another

1   way, Plaintiffs struggle to identify even a single person who belongs in the class, *i.e.*,

2   someone who claims that he or she bought Kraft Fat Free Shredded Cheddar

3   "*because*" of the "natural cheese" statement.   That is a red flag about the

4   manageability problems in this class. As in *Gannon*, "it would be extremely difficult

5   to ascertain the identities of the individuals who [purchased Kraft Fat Free Shredded

6   Cheddar *because of* the 'natural cheese' label]."   For each of the tens of thousands of

7   people who bought Kraft Fat Free Shredded Cheddar, this Court would have to assess

8   each consumer's subjective reasons for buying the product and determine whether he

9   or she bought it because of the term "natural cheese" or some other reason.   This

10  Court would have to undertake that gargantuan task to find the small sliver of

11  individuals who belong in the class.   Because individual questions of reliance have

12  been embedded into the class definition, identification of class members is an

13  unmanageable task.[6]

14       Further, the class definition limits membership to those who believe "natural

15  cheese" means "no artificial ingredients," which adds additional hurdles to identifying

16  class members.   The Court would first have to determine which of those individuals

17  who purchased the product because of the "natural cheese" label interpreted that

18  phrase to mean the cheese contained "no artificial ingredients," as opposed to meaning

19  that it was made directly from milk (as distinguished from processed cheese), or some

20  other interpretation.   Then, for those who believed "natural cheese" meant "no

21  artificial ingredients," the Court would need to address their view of "artificial

22  ingredients."   Since the class is limited to those who "made purchasing decisions due

23  to [Kraft Heinz's] *deception*" (ECF. No. 78 at 15 (emphasis added)), class

---

[6] The Ninth Circuit has held that when "the issue of reliance 'would vary from consumer to consumer,'" the class "should not be certified." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (citation omitted).

MOTION FOR DECERTIFICATION

membership turns on whether a putative class member considered titanium dioxide and annatto to be "artificial ingredients."   Here, Kraft has presented substantial evidence that both are in fact naturally sourced ingredients:

- Annatto extract is made from annatto seed, which undisputedly is natural.  21 C.F.R. § 73.30(a).

- Titanium dioxide is a mineral that exists in nature.  As Kraft's expert, Dr. Kantha Shelke, has opined, "titanium dioxide exists in nature and/or is also derived from minerals for applications in the food industry." Ex. 3 ¶ 11.

- And Kraft's senior group leader of research and development, Danielle Weiss, testified that "the product contains colors that are naturally derived, that neither annatto nor titanium dioxide are "artificial color"; and that "annatto is derived from a seed base.  Titanium dioxide is a mineral; both naturally occurring." Ex. 11 at 29:24-30:1, 30:12-21, 63:2-6, 36:18-19.

Thus, even if this Court determines that a putative class member purchased Kraft Fat Free Shredded Cheddar *because of* the "natural cheese" label, it would be forced to engage in additional inquiries as to that individual's interpretation of "natural cheese" and his or her views on annatto and titanium dioxide.  Such mini-trials are administratively infeasible.

### B. The class is an unmanageable fail-safe class.

Plaintiffs' class must also be decertified because it is an improper fail-safe class, *i.e.*, it is "defined in a way that precludes membership unless the liability of the defendant is established."  *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010).  As the Ninth Circuit has explained, "[w]hen the class is so defined, once it is determined that a person, who is a possible class member, cannot prevail against the defendant, that member drops out of the class.   That is palpably unfair to the defendant, and is also unmanageable-for example, to whom should the class notice be sent?"  *Id.*; *see also Ratnayake v. Farmers Ins. Exch.*, No. 11-1668, 2015 WL 875432, at *1, 4 (D. Nev. Feb. 27, 2015); *Rockwell v. Chase Bank USA, N.A.*, No. 10-1602,

2012 WL 4846177, at *1 (D. Wash. Oct. 11, 2012); *Rodriguez v. Gates*, No. 99-13190, 2002 WL 1162675, at *9 (C.D. Cal. May 30, 2002).

*Brazil v. Dell Inc.* is instructive.  There, the court struck the class as "fail-safe" where "the proposed classes include[d] California persons or entities who purchased Dell computer products that 'Dell falsely advertised,'" and thus "[t]o determine who should be a member of these classes, it would be necessary for the court to reach a legal determination that Dell had falsely advertised."  585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008).  Here, similarly, the class is limited to "those consumers *that were misled* by Kraft's use of the term 'natural cheese,' and made purchasing decisions due to *that deception* and not for other reasons."  ECF No. 78 at 15 (emphasis added).  Thus, the Court must first determine that Kraft misled consumers through deceptive labeling — *i.e.*, it must make "a legal determination that [Kraft] had falsely advertised" (*Brazil*, 585 F. Supp. 2d at 1167) — prior to ascertaining membership in the class.  *See* ECF No. 274 at 19 (noting that "[t]he class is defined as those who purchased the Product '*because* [it] was described as 'natural cheese,' . . . but this definition was not based on a finding that there were reasonable consumers who did so").  The class is therefore impermissibly fail-safe, and must be decertified.

### C. The class violates Kraft's due process rights.

The class definition also implicates Kraft's due process rights because there is no objective way to ensure that Kraft does not pay more than its aggregate liability.  In *Briseno*, the Ninth Circuit noted that "in cases in which aggregate liability can be calculated" "by (1) calculating the price premium attributable to the allegedly false statement that appeared on every unit sold during the class period, and (2) multiplying that premium by the total number of units sold during the class period . . . [,] 'the identity of particular class members does not implicate the defendant's due process interest'" because "the aggregate amount of liability will be determinable even if the identity of all class members is not."  844 F.3d at 1132 (citation omitted).

Here, unlike in *Briseno*, Kraft's aggregate liability is dependent on the number

of consumers who self-identify as having purchased Kraft Fat Free Shredded Cheddar
"because [it] was described as 'natural cheese,' which meant that it contained no
artificial ingredients."  ECF No. 78 at 15.[7]  Because it is entirely unknown how many
individuals fit this description, there is no way for Kraft to determine its aggregate
exposure here, raising the possibility that unverifiable affidavits from putative class
members would "subject [Kraft] to greater liability or alter [its] substantive rights."
*Arizona Citrus Growers*, 904 F.2d at 1307 (permitting cy pres distribution of
unclaimed funds because it did *not* "subject defendants to greater liability or alter their
substantive rights").  These due process concerns militate in favor of decertification.

### III.    The Class Should Be Decertified Because Class Counsel Are Inadequate.

"In order for the class to remain certified, the [C]ourt must find that the
prerequisites of Rule 23(a) are met, including that the plaintiffs and their counsel are
capable of adequately representing the interests of the entire class, including absent
class members."  *Ries v. Arizona Beverages USA LLC*, No. 10-1139, 2013 WL
1287416, at *8 (N.D. Cal. Mar. 28, 2013); *see also Rattray v. Woodbury Cnty., IA*,
614 F.3d 831, 835 (8th Cir. 2010) ("The inquiry into adequacy of representation . . .
requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to
ensure due process for absent class members.").  Rule 23 identifies additional factors
that the Court also "must consider" in appointing class counsel, including counsel's
experience, knowledge of the applicable law, and the resources they will commit to
representing the class. Fed. R. Civ. P. 23(g)(1)(A).

When Plaintiffs moved for class certification, they argued that the adequacy
prong was satisfied because of Milstein Adelman's "significant experience in

---

[7] Dr. Bodapati opines that "[t]o estimate the total Compensation Amount for the class, the
appropriate approach here would be to multiply the mean Compensation Amount by the total
number of units sold." Ex. 2 at 13. This is patently incorrect, as the "total number of units sold"
would only be relevant if the class included *all* Kraft Fat Free Shredded Cheddar consumers. That is
not the case here.

prosecuting large consumer fraud class actions." ECF No. 47-1 at 14 & n.3; ECF No. 47-2 (Declaration of Paul Stevens describing the qualifications, accomplishments, and capabilities of Mr. Stevens and the Milstein Adelman firm). Plaintiffs, however, provided no evidence of the Clarkson Law Firm's experience, qualifications, or resources. *See id.* Since the Court's order certifying the class, however, both Paul Stevens and the Milstein Adelman firm have withdrawn, leaving only the Clarkson Law Firm. ECF Nos. 98, 142.[8] Plaintiffs have never provided any information whatsoever to satisfy their burden of proving that the Clarkson Law Firm has the experience, qualifications, or resources necessary to vigorously and adequately represent the class, or that it has ever served as sole counsel for a certified class.

In assessing whether the adequacy prong continues to be satisfied, the Court should also "consider the actual progress of the proceedings to that point." *Buckland v. Maxim Healthcare Servs., Inc.*, No. 11-8414, 2012 WL 3705263, at *6 (C.D. Cal. Aug. 27, 2012) (quoting *Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634 (C.D. Cal. 2010)). In granting certification, this Court emphasized the absence of "any evidence that Plaintiffs' counsel will not prosecute the action vigorously on behalf of the proposed class." ECF No. 78 at 5. But that is no longer true. To the contrary, as in *Ries*, where the court decertified a class of iced tea purchasers, "plaintiffs' counsel has been dilatory and has failed to prosecute this action adequately." 2013 WL 1287416, at *9.[9] *See also Niemeyer v. Williams*, 910 F. Supp. 2d 1116, 1132 (C.D. Ill.

---

[8] When Paul Stevens withdrew from the case in December 2015, the Clarkson Law Firm recruited Milstein Adelman attorneys Gillian Wade and Sara Avila, well-known class action practitioners, to substitute in as class counsel. ECF Nos. 98-100. But Ms. Wade and Ms. Avila also subsequently withdrew (ECF Nos. 142, 143), leaving the Clarkson Law Firm as the only firm representing Plaintiffs and the class. The voluntary withdrawal of two lawyers known for their class action litigation (after the case has been certified) is a red flag for this Court.

[9] *See also, e.g., Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592-93 (7th Cir. 2011), *as modified* (Sept. 22, 2011) (affirming denial of certification in light of concerns about counsel's "diligence, respect for judicial resources, and promptness"); *Kaur v. Things Remembered, Inc.*, No. 14-5544, ECF No. 61 at 1 (N.D. Cal. Apr. 20, 2016) (citation omitted) (denying certification "because the

(Continued…)

2012) (denying certification where "counsel has shown problems with meeting deadlines, frequently needing extensions and delaying proceedings").   Plaintiffs' counsel has engaged in the following conduct contrary to the class's interests:

- *Submission of untimely expert report.*  Plaintiffs failed to submit a timely expert report from Dr. Bodapati despite (1) multiple extensions of the expert disclosure deadline (*see, e.g.*, ECF No. 145; ECF No. 145-1, Ex. E); (2) Plaintiffs' acknowledgement that expert testimony is a "crucial component" of their case (ECF No. 150 at 1) and (3) the Court's warning that failure to offer sufficient damages evidence could result in decertification (ECF No. 78 at 9). The Court found that Plaintiffs had "not justified their failure to submit a complete, timely expert report."  ECF No. 271 at 21.

- *Submission of untimely rebuttal expert report.* Plaintiffs continued their disregard of the Court's deadlines by completely ignoring the April 12, 2016 expert rebuttal deadline, then serving Dr. Bodapati's rebuttal report on *January 19, 2017* — over 9 months late.[10]  *See Niemeyer,* 910 F. Supp. 2d at 1132 (denying certification where "counsel has shown problems with meeting deadlines, frequently needing extensions and delaying proceedings").

- *Failure to retain marketing expert.*  Plaintiffs' counsel failed to retain a marketing expert to establish the materiality of the "natural cheese" label, and instead attempted to rely on inadmissible generic consumer surveys, which were rejected as hearsay.

---

lawyers for the plaintiff cannot be trusted to 'prosecute the action vigorously'" given discovery delays and unprofessional conduct, including waiting until the day before the discovery cut-off to continue deadlines in order to raise purported discovery disputes).

[10] Ex. 16 at 20:14-18 (In response to Kraft's inquiry, "Does your Honor's April 12th rebuttal date still apply to the Plaintiffs because we timely served our report," the Court stated:  "It does.  The dates are all in place.").

- *Submission of fatally flawed damages expert report.*  As outlined above and in the concurrently-filed *Daubert* motion, Plaintiffs' counsel have staked their case on an unreliable damages report that fails to establish class-wide damages.

- *Failure to depose Kraft's experts.*  Plaintiffs' counsel has chosen not to take any discovery of Kraft's experts, even though the experts' opinions directly impact Plaintiffs' ability to maintain a class and recover class-wide damages.[11]

- *Lack of experience.*  Plaintiffs' counsel have not identified a single trial that they have first-chaired, or served a sole lead counsel on any significant matter.

- *Inability to fund the case.*  Nor have Plaintiffs' counsel shown that they have the resources to fund and try this case.  They appeared to make strategic decisions due to costs considerations (*e.g.*, failure to depose Kraft's experts).

- *Failure to retain scientific experts.*  At trial, they will need to prove that the two ingredients at issue are "artificial," but they have not proffered a single witness.

In short, Plaintiffs' counsel's continuous disregard for this Court's deadlines, combined with their failure to follow the rules of evidence and procedure, "could have prejudiced the class had the Court not granted relief from counsel's errors."  *Kandel*, 264 F.R.D. at 635.  Under these circumstances, the Court "has a responsibility" to decertify the class.  *Id.* (denying certification because of concerns that proposed class counsel "cannot be relied on to prosecute the class's claims in a competent manner").

## CONCLUSION

For the foregoing reasons, Kraft respectfully requests that the Court issue an order decertifying the class.

---

[11] Due to timing issues, Plaintiffs were granted an extension to depose one of Kraft Heinz's experts after the discovery cut-off, on May 13, 2016.  ECF No. 141.  But Plaintiffs then decided not to go forward with that deposition either.

Dated: February 15, 2017

JENNER & BLOCK LLP

  /s Kenneth K. Lee
By: Kenneth K. Lee

Attorneys for
Kraft Heinz Company