UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
|---|---|

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**     **(IN CHAMBERS) ORDER RE DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' SURVEY AND EXPERT TESTIMONY OF DR. ANAND V. BODAPATI (REDACTED DKT. 284, UNSEALED DKT. 297); DEFENDANTS' MOTION FOR DECERTIFICATION (REDACTED DKT. 285, UNSEALED DKT. 294); DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (REDACTED DKT. 286, UNSEALED DKT. 295)**

## I.     Introduction

On May 7, 2014, Claudia Morales ("Morales") and Mocha Gunaratna ("Gunaratna") (collectively, "Plaintiffs") brought this action in the Los Angeles Superior Court against Kraft Foods Group, Inc. ("Kraft" or "Defendant"). Plaintiffs allege that they were misled by Kraft's use of the term "natural cheese" on its "Natural Cheese Fat Free Shredded Fat Free Cheddar Cheese" (the "Product"). Dkt. 40 at ¶¶ 12-20. Kraft removed the case on June 6, 2014, pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C §§ 1332(d), 1441(b) and 1446. Dkt. 1.

On November 7, 2014, the parties stipulated to Plaintiffs' filing of a Second Amended Complaint ("SAC"). Dkt. 38. Plaintiffs filed the SAC on November 14, 2014. Dkt. 40. It advances three causes of action: (1) false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL"); (2) false and misleading advertising in violation of Cal. Bus. & Prof. Code §§ 17500 et seq. ("FAL"); and (3) violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq. ("CLRA"). Dkt. 40.

On December 3, 2014, Plaintiffs moved to certify a class. Dkt. 47. That motion was granted in part on June 23, 2015. Dkt. 78. The certified class ("Class") was defined as: "All persons who, between May 7, 2010 through the present [(the "Class Period")], purchased the Product in the State of California for personal use and not for resale and who did so because the Product was described as "natural cheese," which meant that it contained no artificial ingredients." Id. at 15.

On February 16, 2017, Kraft filed three motions: (1) a Motion for Decertification (Dkt. 285 (redacted); Dkt. 294 (unsealed)); (2) a Motion for Partial Summary Judgment ("Motion for Summary Judgment," (Dkt. 286 (redacted); Dkt. 295 (unsealed)) and (3) a Motion to Exclude Plaintiffs' Survey and Expert Testimony of Dr. Anand V. Bodapati ("Motion to Exclude," (Dkt. 284 (redacted); Dkt. 297 (unsealed)). Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

opposed each of these motions. Dkt. 311 ("Opposition to Motion for Decertification"); Dkt. 309 ("Opposition to Motion for Summary Judgment"); Dkt. 308 ("Opposition to Motion to Exclude"). Kraft replied. Dkt. 317 ("Reply to Motion for Decertification"); Dkt. 319 ("Reply to Motion for Summary Judgment"), Dkt. 318 ("Reply to Motion to Exclude").

A hearing on the Motions was held on March 27, 2017. Dkt. 322. Thereafter, on May 15, 2017, an evidentiary hearing was held at which Bodapati and Defendants' expert Ronald T. Wilcox provided testimony as to the relationship between the conjoint analysis Bodapati performed and the market pricing of the Product. Dkt. 336.

For the reasons stated in this Order, the Motion to Exclude is **DENIED**, the Motion for Decertification is **GRANTED** without prejudice to recertification of an injunctive relief class under Rule 23(b)(2), and the Motion for Summary Judgment is **GRANTED IN PART**.

## II.   Factual and Procedural Background

The SAC alleges that the Product was "labeled and otherwise advertised as 'natural' despite containing artificial ingredients, specifically, 'artificial color.'"[1] SAC, Dkt. 40. It alleges that Morales and Gunaratna each purchased the Product in reliance on the "natural cheese" label on the front of the packaging. *Id.* at ¶¶ 12-15.

On March 15, 2016, Plaintiffs moved for partial summary judgment as to liability for violations under the UCL, the FAL, and the CLRA. Dkt. 115. On March 29, Kraft filed a motion to strike the proffered expert testimony of Dr. Anand V. Bodapati ("Bodapati"). Dkt. 129. Both Plaintiffs' Motion for Partial Summary Judgment and Kraft's Motion to Strike were argued on June 13, 2016, and taken under submission. Dkt. 177. On June 27, 2016, Kraft moved for summary judgment. Dkt. 182. A hearing was held on September 26, 2016, and the matter was taken under submission. Dkt. 259.

In an Order issued on December 2, 2016, both motions for summary judgment and the motion to strike were denied. Dkt. 271. This Order concluded that the following triable issues of fact had been presented: "First, whether consumers are likely to believe that 'artificial color' is not an artificial ingredient if it is produced by a natural product. Second, whether such belief is material to customers' purchasing decisions. And third, whether all artificial colors, regardless of source, are artificial ingredients." *Id.* at 25.

The order also recognized that the supplemental expert report of Bodapati contained previously undisclosed information and opinions. *Id.* at 21. However, it concluded that any prejudice to Kraft from the late disclosure could be cured by extending the deadlines for the Rebuttal Expert Disclosures, Expert Discovery Cut-Off, Last Day to File Motions, Last Day to Hear Motions, Final Pretrial Conference and Jury Trial. *Id.* at 22. Further, the order stated that the arguments Kraft had raised as to the inadequacy of Bodapati's reports would be better addressed in a motion brought pursuant to Fed. R. Civ. P. 26 andunder *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *Id.*

---

[1]  The Complaint did not specify the allegedly artificial ingredients found in the Product. Subsequent discovery supports the claim that the ingredients at issue are titanium dioxide and annatto extract, which provide the Product with its orange color. See Dkt. 271 at 2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

III.     **Motion to Exclude (Dkt. 284 (redacted); Dkt. 297 (unsealed))**

      **A.     Background**

            1.     Reports and Testimony of Bodapati

                  a)     Bodapati Reports

On March 14, 2016, Plaintiffs disclosed to Defendant the first expert report by Dr. Anand V. Bodapati ("Bodapati"). Ex. 1 to Declaration of Kenneth Lee ("Lee Decl."), Dkt. 287-1. This report disclosed his qualifications and described the methodology of his planned study. *Id.* Bodapati has been a Professor of Marketing at the UCLA Anderson School of Management since 2000. *Id.* at 4. From 1996 to 2000, he served on the faculty at Kellogg School of Management at Northwestern University. *Id.* Bodapati's teaching has "related to Marketing, Consumer Psychology, Consumer Behavior, and Statistical Methods for making inferences from data on how consumers respond to product offerings, pricing, advertising, and other marketing activity in the marketplace." *Id.* His research has been

> directed toward characterizing how consumers make purchasing decisions, deriving predictive models to make assessments of consumer preferences and purchase behaviors when presented with products and advertising, developing applied statistics methodologies to estimate the model parameters from data, and developing data collection methods that would lead to datasets that lend themselves to supportable inferences about consumer behavior.

*Id.*

Bodapati has "on numerous occasions been engaged as a consultant by firms to advise on the assessment of customer behaviors and response to market actions by firms." *Id.* at 5. This report included Bodapati's "opinion on the existence of methodologies that can evaluate and quantify the impact of a certain set of shredded fat-free cheese products from Kraft Foods being identified as "natural cheese." *Id.* at 6. The report then stated:

> Of particular interest is the price premium for labeling as "natural cheese" of Kraft's shredded fat free cheddar cheese product, interpreted as the price difference that would make a consumer indifferent between Kraft's shredded fat free cheddar cheese product with the "natural cheese" attribute and Kraft's shredded fat free cheddar cheese product without the "natural cheese" attribute.

*Id.* Bodapati concluded that an "incentive-aligned conjoint analysis" would be the best method to calculate such a price premium. *Id.*

Bodapati's supplemental report provided the results of the study. Ex. 2 to Lee Decl., Dkt. 287-2. It included the following description of its purpose:

> The subject of this Supplemental Expert Report is my calculation of the dollar compensation amount, if any, that a consumer needs to be compensated by to have Kraft's shredded fat free cheddar cheese product with the "natural cheese" attribute be replaced by Kraft's shredded fat

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|----------|--------------------------|------|--------------|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

free cheddar cheese product without the "natural cheese" attribute ("Compensation Amount").

*Id.* at 4.

The supplemental study was based on a survey of 464 respondents, who are described as "California purchasers of the Product." *Id.* The report then stated:

> However, the class is limited to those who placed importance on the "natural cheese" attribute in making their purchase decision, *i.e.*, California consumers who purchased the Product "because the Product was described as 'natural cheese,' which meant that it contained no artificial ingredients." Thus, the true Compensation Amount for members of the Class would be greater than this overall mean . . .

*Id.* at 4-5.

The study design was described as follows:

> [C]onsumers are presented decision situations where they are asked to choose one product from a choice set of items (presented with prices), consisting of cheese items corresponding to (a) the marketplace offerings of some leading manufacturers and (b) Kraft's shredded fat free cheddar cheese product as it was offered in the marketplace with the "natural cheese" label, and/or (c) a product that is identical to Kraft's shredded fat free cheddar cheese product as it was offered in the marketplace except that it is without the "natural cheese" label. The products corresponding to (a) and (b) are represented through color photographic images of these products. The product corresponding to (c) is represented through a color photographic image of the Kraft's shredded fat free cheddar cheese product, digitally altered to excise the "Natural Cheese" label. This experimental component allows us to measure the impact of the "Natural Cheese" label distinct from the impact of the other attributes that are confounded or correlated with the "Natural Cheese" label in the marketplace. The different combinations of products and prices and their orderings are chosen randomly. Each consumer is presented multiple choice sets. The corresponding choice decisions of the consumer are recorded.

Id. at 7.

Each respondent was presented with 14 screens that provided them with a choice between a shredded cheese product with or without the words "natural cheese" on the packaging. *Id.* at 9. The prices of the cheese products across the 14 screens were drawn from the following set of price differences: -$1.8, -$0.50, $0, $0.20, $0.30, $0.40, $0.50, $0.60, $0.70, $0.80, $1.00, $1.50. $2.50, $4.50. *Id.* at 10. The supplemental report stated that these price differences "were chosen on the basis of statistical analysis of a pilot sample of 100 subjects." *Id.*

The supplemental report identified three key aspects of the study that would enhance the reliability of the assessments by Bodapati. These included:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

- Sampling: "The participants of the conjoint experiment data collection must be representative of the target population. The target populations [sic] is the population of buyers of Kraft Natural Cheese Fat Free Cheddar Cheese. We have an explicit screener question that screens out those who, in their self-report, have not bought this product in the previous six months."

- The realism of the stimuli: "The stimuli consist of choice sets of price-product combinations as described in the previous section. The study design uses clear resolution images to represent the products. The prices are carefully chosen to reflect the price distribution in the actual marketplace."

- Cognitive overloading: "[I]f a conjoint study has many attributes and many choice sets, there can be cognitive overloading that leads to consumers not processing the choice tasks with the attention they would accord in the marketplace. The risk of cognitively overloading is very low in this study design because there are only two attributes, the product and the price, and the number of choice sets is not large."

*Id.* at 11-12.

The survey results showed that 26% of consumers place a relatively high value on products associated with the term "natural cheese," *i.e.,* would pay more than $1 extra for a product with the "natural cheese" label, and 12% would pay more than $2 extra for such a product. *Id.* at 14. Bodapati concluded that, on average, customers would be willing to pay $0.747 more for a product that used the label "natural cheese" than for one that did not include that term on its label. *Id.*

       b)    Bodapati's Deposition

Bodapati was deposed by Defendant on January 16, 2017. Ex. 12 to Lee Decl., Dkt. 287-12. During his testimony he stated that he had not reviewed any of the filings or the operative complaint in this case. *Id.* at 3 (15:11-25). He also stated that he had done research in the past regarding the marketing of sliced and shredded cheese. *Id.* at 4 (18:13-14). Specifically, he studied "statistical methodology development, where the goal is to come up with more sophisticated methods on how to estimate consumer response to marketing, to pricing and location of the store and, you know, all factors that do influence consumer decision making." *Id.* (18:19-24).

Bodapati also testified that, given the way the survey was designed, "the reasonable consumer would infer by the end of the survey, surely, that it is about Kraft products and about the natural cheese label because of the way the survey is constructed. But was it fed and did that shape the context, was it injected into the consumer, I would say the answer is no, just by my interpretation and what we sought to do." *Id.* at 5 (31:2-11). He also testified that "the overarching concern is verisimilitude" in conducting a study such as the one at issue. *Id.* (32:5-6). He added that, because in a conjoint analysis, "there is no right answer," there is less risk that a respondent will be biased by the way the questions are presented. *Id.* (32:25). Moreover, he stated that he concluded that presenting respondents with only the front panel of the Product packaging was consistent with their shopping experiences. Thus, supermarket shoppers often do not touch products while they are making purchasing decisions. *Id.* at 6 (34:8-10). He stated that he did not believe allowing respondents to see the back of the packaging "affects the decision function

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

significantly in a way that would change the result substantially." Ex. 1 to Declaration of Ryan J. Clarkson ("Clarkson Decl."), Dkt. 312-1 at 19 (118:1-3).

Bodapati also testified that he had not done a conjoint analysis study previously "going all the way from focus groups to the actual analysis," but he had previously worked on the "core aspects of the data analysis and the conclusions." Ex. 12 to Lee Decl., Dkt. 287-12 at 6 (35:10-19). He stated that he had designed projects before, but his expertise was in the "core analysis." *Id.* (36:13). He also stated that he could not recall having worked on a conjoint analysis that involved only two varying attributes. *Id.* at 8 (42:14-20). However, he opined that having fewer attributes is better for the results "in the sense that it reduces cognitive overloading and thereby increases the fidelity of the decision making." *Id.* at 7 (41:13-16).

Regarding a price premium, Bodapati stated that it "means many things to many different people." *Id.* at (38:6-7). He stated, "One aspect of price premium is attribute value, but there is more to price premium, for example, status signaling." *Id.* (38:8-10). He also stated that "there's many, many considerations involved in price setting." *Id.* at 16 (74:4-5).

Bodapati testified that he had not calculated "[a]ctual damages . . . for any litigation." *Id.* at 9 (48:7-8). Rather, he said, "I was charged with the issue of determining what additional increment a person is willing to pay for [the 'natural cheese'] label." *Id.* at 25 (163:3-5). He explained: "Let me make a very strong point over here that marketplace analyses and conjoint analyses operate in very different spheres with very different datasets albeit towards the same objective." *Id.* at 28 (197:20-24). He stated that he had been retained to conduct a "statistical empirical analysis and estimate a compensation amount, a compensation for a consumer buying a product believing it to have a certain attribute, the amount to be compensated if the product did not, in fact, have that attribute." Ex. 1 to Clarkson Decl., Dkt. 312-1 at 3-4 (9:25 -10:5).

Bodapati also stated that he set the price points in the study using "knowledge . . . that I've internalized over the years over previous projects that did impinge on this particular study. . . ." Ex. 12 to Lee Decl., Dkt. 287-12 at 16 (77:4-8). Specifically, he said that he recalled a Nielsen dataset that included prices from 80 cents to $8.00. *Id.* at 20 (90:18-23). He recalled that the middle of the data was in the $3.00 to $4.00 range. *Id.* (91:8-9). Using those amounts as a baseline, he selected a range of $2.29 to $4.29 as the price distribution for the survey. *Id.* (92:1-16).

As to his calculation of the compensation amount, Bodapati said that he set that amount at zero for respondents who indicated a negative valuation for the label "natural cheese" because "they got the preferred product." Ex. 1 to Clarkson Decl., Dkt. 312-1 at 25 (159:24-160:3). He also stated that he set the upper limit for the compensation amount at $4.50 "[b]ecause that was what the distribution suggested by the pilot sample was." *Id.* at 26 (162:9-13).

Bodapati testified that, although he screened for respondents who had purchased Kraft shredded cheese within the last six months, he did not specifically ask whether they had purchased Kraft fat free natural shredded cheddar cheese. Ex. 12 to Lee Decl., Dkt. 287-12 at 21-22 (97:22-98:8). This was because "[w]hat that would have done is it would have made the list very long and created cognitive fatigue." *Id.* at 22 (98:17-19). He then explained, "I did not have a prima facie reason to believe that the value of the natural cheese attribute, which is the entire focus of this research, for people who were included in this

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

study, even though they did not buy Kraft natural cheese, would be different." *Id.* (99:5-10). He also stated that he did not include a "none of the above option" in the study because "the validity of the calculation of the attribute value sustains even without the presence of other alternatives." Ex. 1 to Clarkson Decl., Dkt. 312-1 at 21 (135:24-136:2).

        2.    Defendant's Evidence

            a)    Simonson Rebuttal Report

Dr. Itamar Simonson ("Simonson") is the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business at Stanford University. Ex. 4 to Lee Decl., Dkt. 287-4 at ¶ 1. He specializes in consumer behavior, marketing management, trademark infringement from the perspective of consumers, survey methods, and human judgment and decision making. *Id.* at ¶ 3. His research "has focused on buyers' purchasing behavior, the effect of product characteristics (such as brand name, price, and features), the competitive context, . . . marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement from the customer's perspective." *Id.* He has "conducted, supervised, or evaluated well over 1,000 marketing research surveys, including many related to consumer behavior and information processing, trademark, branding, marketing strategies, and advertising-related issues." *Id.* at ¶ 8.

Simonson submitted a report that responded to Bodapati's report. There, Simonson identified what he opined were several flaws in Bodapati's survey. Ex. 5 to Lee Decl., Dkt. 287-5. Simonson summarized his opinions as follows:

- "The survey misrepresented the manner in which the product at issue -- the Kraft fat free shredded cheddar cheese -- is seen and evaluated by consumers in reality. Among other misrepresentations of reality, respondents were unrealistically shown two virtually identical packages of the product at issue side-by-side, with the only difference being the 'Natural Cheese' label at issue."

- "[R]espondents were not allowed to observe the product information (such as the nutrition information) that is readily available to shoppers in a store environment."

- "The survey design revealed the purpose of the study, leading consumers to the 'correct' answer."

- "Despite the focus on just one difference between the (front panel) of the two presented packages, the survey failed to use a standard experimental design, with a test group and a control group, and used instead a conjoint methodology that is not suitable for choices between options that differ on just one attribute. The survey also led respondents to consider unrealistically low prices (*i.e.*, much lower than real market prices) of the package without the "Natural Cheese," label, making it appear as low quality; this bias was likely to further exacerbate the biased estimate of the value of the label."

*Id.* at ¶ 4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

Simonson further stated that "[a] conjoint study with effectively one differentiating attribute is extremely unusual." *Id.* at ¶ 22. He explained that "when one feature is tested, the obvious design is to have a Test Group with the tested feature and a Control Group without the feature." *Id.*

Simonson also provided his opinion that the Bodapati survey "suffered from a severe order effect":

> In particular, respondents were asked a series of questions about their preferences between two products that differed with respect to the "Natural Cheese" label. The price difference between the two products varied from one problem to the next. This meant that the answers to early questions were likely to influence and serve as anchors to subsequent answers.

*Id.* at ¶ 26. He also stated that the study failed to include a suitable control group, and did not give respondents an opportunity to explain their answers. *Id.* at ¶¶ 27, 29.

> b)      Emmert Rebuttal Report

Michael P. Emmert ("Emmert") is a Managing Director with Navigant Consulting, Inc. Ex. 6 to Lee Decl., Dkt. 287-6 at ¶ 1. Emmert has "provided accounting, auditing, financial and dispute resolution related services to a wide variety of organizations" over a 40-year career. *Id.* at ¶ 11. He has "testified in federal and state courts, arbitration proceedings and before regulatory boards," and has been "qualified as an expert on a variety of financial and accounting issues, including the calculation of financial losses, damages quantification methodologies and other subjects." *Id.*  He has "also served as a neutral arbitrator." *Id.*

Emmert prepared a report in which he evaluated and criticized the methodology of the Bodapati report as to the calculation of damages. *Id.* at ¶ 8. This report identified the following claimed defects in the Bodapati's study:

> (1) Dr. Bodapati's use of an unsound damages methodology that is inconsistent with the historical claims of the Plaintiffs; (2) the inadequate, unverifiable, and incomplete data and information on which Dr. Bodapati relies; (3) the failure to measure damages over the alleged damages period; and, (4) failing to demonstrate how the alleged misleading labeling of the Product can be measured on a class-wide basis.

*Id.*

Emmert opined that Bodapati provided no evidence of the source for the prices presented in his survey or for the price distribution he identified in the marketplace. *Id.* at ¶ 9. Further, he declared that Bodapati did not provide information on his statistical analysis of the pilot sample or the results of his examination of the shredded cheese market in California. *Id.* Emmert also stated that Bodapati did not identify the documents he reviewed as part of his research on the psychology of questionnaire response, the standard best practices for sample selection, or the key aspects of data collection with respect to the use of conjoint analysis. *Id.* at ¶ 9. Emmert then provided his opinion that the results of Bodapati's survey did not take into account historical purchase quantities and sales prices paid for the Product. *Id.* at ¶ 21. Further, he asserted that participants in the survey were not limited to purchasers of Kraft Natural Cheese

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

Fat Free Shredded Cheese. *Id.* at ¶ 27. Rather, the only screening question presented to respondents was whether they had purchased Kraft shredded cheese within the last six months. *Id.* The survey also did not provide an option for respondents not to answer the question. *Id.* at ¶ 62.

Emmert added that Bodapati failed to "understand and verify the reasonableness, accuracy and quality of the population of potential survey respondents and the methodology and process followed" by Davis Research and Research Now, the two firms engaged to conduct the survey. *Id.* at ¶ 29. In addition, he concluded that the survey results show that consumer preferences vary substantially and are sometimes irrational. *Id.* at ¶ 33. Emmert next criticized the survey for failing to account for a high prevalence of irrational responses. *Id.* Emmert also stated that Bodapati's study "is not a reliable basis to measure damages in this matter because it ignores competitive market factors that would influence the price paid for the Product over a six-year period." *Id.* at ¶ 34. Emmert also opined that conjoint analysis is not an appropriate means to calculate damages; rather, it is generally used "to better understand consumer preferences and purchase decisions to test new product designs, assess advertising or develop product positioning, among other factors." *Id.* at ¶ 41.

Emmert also stated that the Bodapati report

> fails to consider the basic principles of a reliable damages methodology and presents an academic, insufficiently detailed analysis that: [(]1) does not fully examine the value of all attributes of the Product to isolate only the value (if any) consumers place on the "natural cheese" labeling; [(]2) is not based on the actual prices paid by Plaintiffs and other potential class members; and, [(]3) fails to consider the quantities of the Product actually purchased and that would have been purchased even if consumers were aware of the alleged mislabeling of the Product.

*Id.* at ¶ 8.

Specifically, Emmert stated that the damages calculation "fails to identify which consumers were damaged and should be included in the determination of class damages." *Id.* at ¶ 48. Further, the damages calculation

> assumes that each class member paid the exact same price for the Product even though it is highly likely that the actual purchasers of the fat-free shredded cheddar cheese did so at different locations, different time periods, and subject to promotions and discounts; all of which could significantly influence the actual prices paid by consumers and the amount of any potential damages suffered.

*Id.* at ¶ 49. It also assumes that each consumer ascribes the same value to the words "natural cheese." *Id.* at ¶ 50.

Emmert concluded with the opinion that the $.75 amount derived from Bodapati's calculations is "unreasonable and unreliable." *Id.* at ¶ 64. This was due to the following actions by Bodapati: (1) selectively and arbitrarily excluding respondent answers that were unreasonably high; (2) improperly altering the responses by respondents who were not influenced by the words "natural cheese" from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

negative values to $0; (3) improperly using a simple average of the compensation amounts reported by survey respondents despite the large concentration of respondents with significantly lower compensation amounts; and (4) calculating a compensation amount that reflected an unreasonable market price. *Id.* at ¶¶ 72-81.

> c)     Wilcox Rebuttal Report

Dr. Ronald T. Wilcox ("Wilcox") is the NewMarket Corporation Professor of Business Administration at Darden School of Business at the University of Virginia. Ex. 7 to Lee Decl., Dkt. 287-7 at ¶ 1. He received an undergraduate degree in economics from Xavier University, and a Ph.D. in Business Administration from Washington University in St. Louis. *Id.* His general areas of expertise are branding, customer relationship management, marketing of financial services, conjoint analysis and the public policy implications of marketing. *Id.* at ¶ 2. He has published articles in academic journals including the *Journal of Marketing Research*, *Marketing Science*, *Management Science* and the *Journal of Business*, and in publications including the *Wall Street Journal*, *BusinessWeek*, *Fortune*, *Forbes* and the *Weekly Standard*. *Id.* He co-authored a book titled *Cutting Edge Marketing Analytics,* authored *What Happened to Thrift?*, and has served as a marketing consultant to a number of organizations. *Id.* at ¶ 3.

Wilcox submitted an expert report that addresses Bodapati's use of a conjoint analysis. That report defines conjoint analysis:

> Conjoint Analysis is a marketing research technique designed to help analysis determine the preferences of customers and potential customers. In particular, it seeks to determine how consumers value the different attributes that make up a product and the tradeoffs they are willing to make among the different attributes or features that comprise the product . . . Literally, conjoint analysis means an analysis of features **CON**sidered **JOINT**ly. A conjoint analysis is used because it is difficult for consumers to tell us exactly how much each attributes [sic] (feature, function, benefits) of a product is worth to them. A conjoint analysis can evaluate consumer preferences for different attributes that make up a product or service by asking respondents to evaluate potential product profiles. This is achieved by experimentally manipulating the features of a product and observing consumers' ratings for that product or choices among competing products.

*Id.* at ¶¶ 15-16.

Wilcox states that "[t]he very essence of a conjoint analysis is that it includes the attributes that are important drivers of choice." *Id.* at ¶ 18. Thus, "[t]he first step in a conjoint analysis is to develop a set of attributes and levels of those attributes which characterize the competitive domain." *Id.* Examples of these attributes could include milkfat content, flavor, size of the packaging and brand. *Id.* at ¶ 19. Varying only a single variable "will induce the well-known cognitive bias commonly referred to as 'anchoring' or 'focalism.'" *Id.* at ¶ 20. Wilcox also opines that the design of Bodapati's survey is flawed because it does not allow the respondent to choose not to answer the question. *Id.* at ¶ 22.

Wilcox also states that Bodapati uses the terms "willingness-to-pay," "price premium" and "compensation amount" interchangeably. *Id.* at ¶ 25. Bodapati defines the compensation amount as "the dollar amount, if any, that a consumer needs to be compensated by to have Kraft's shredded fat free cheddar cheese product with natural cheese replaced by Kraft's shredded fat free cheddar cheese product without the natural cheese attribute." *Id.* Wilcox states that it is an error to use this compensation amount to reflect

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

the price premium, because the "average willingness-to-pay does not represent the price premium Kraft could have charged for this attribute in a competitive market." *Id.* This is because "[f]irms generally do not charge their potential customers based on the average willingness-to-pay when setting prices," because (1) they consider the range of willingness, not just the average, and (2) they consider competitive response. *Id.* at ¶ 26. Wilcox also states that Sawtooth Software, which is the firm that sells the software recommended for conducting a conjoint analysis, recommends against using it to calculate monetary value. *Id.* at ¶ 34. Further, Wilcox states that Bodapati's study did not address market-related factors over time. *Id.* at ¶ 36. Moreover, Wilcox states, real-world market data could have been informative to Bodapati's analysis. *Id.* at ¶ 38.

Wilcox next opines that Bodapati used unsupported sampling and survey instruments. *Id.* at ¶ 43. Specifically, he states that Bodapati's report did not contain any information on the assumptions used in developing the target population for the survey as representative buyers of the Product. *Id.* at ¶ 44. He also opines that Bodapati did not provide adequate information on the sample design. *Id.* at ¶ 45.   Wilcox also states that Bodapati's analysis contained several assumptions that were not adequately supported, including that survey participants are Kraft consumers in California. *Id.* at ¶ 46. Wilcox concludes that the analysis presented by Bodapati is "uninterpretable" as a result of the flaws he has identified. *Id.* at ¶ 51.

d)      Price of Kraft Cheese in Los Angeles Stores

Kraft submitted a declaration from Christina A. Aryafar, an attorney for Defendant. It states that she had visited several grocery stores in the Los Angeles, California area in December 2014, to gather information on the retail prices of a wide range of packaged cheese products. Declaration of Christina A. Aryafar ("Aryafar Decl."), Dkt. 288 at ¶ 2. Aryafar stated that she visited a Target where she observed that 8 oz. packages of Kraft shredded cheese, some of which used the term "natural cheese" on their labels and others that did not, were both priced at $3.09. *Id.* at ¶ 5. She also visited a Walmart Supercenter where she did the same analysis and found that both products were priced at $2.50. *Id.* at ¶ 6. She also visited a Vons grocery store where she made the same survey and found that both products were priced at $2.49. *Id.* at ¶ 7.

**B.      Analysis**

1.      Legal Standard for the Admission of Expert Testimony

A witness who is qualified as an expert by knowledge, skill, experience, training or education may provide evidence through an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts perform a "gatekeeping" function in determining the admissibility of expert testimony.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

*Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 597 (1993). A "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). In determining the reliability of a proffered expert, courts "scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 Advisory Committee's Note (2000 Amendment). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, (1999).

An expert may not present testimony that merely "parrots" the opinion of others, without providing an independent evaluation of the evidence. *See Matter of James Wilson Associates*, 965 F.2d 160, 172-73 (7th Cir.1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him -- information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented.... [T]he judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence"); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.").

2.     Application

Defendant argues that, due to the errors and other defects in Bodapati's report, he cannot be qualified as an expert in the areas on which he has opined. Defendant identify three bases for this position. *First*, Bodapati failed to survey the proper group. Dkt. 284 at 12-16. *Second*, he did not measure or otherwise calculate damages. *Id.* at 16-20. *Third*, he misapplied conjoint analysis methodology by using it in an inappropriate area and ignored fundamental principles that ensure reliable surveys. *Id.* at 20-32.

In general, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 949 (C.D. Cal. 2015). Thus, "as long as they are conducted according to accepted principles, survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a [finder of fact] should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.2 (9th Cir. 1997) (internal citations omitted). These principles are next applied to each challenge made by Defendant

a)     Scope of Survey Respondents

The survey included two screening questions designed to limit the universe of respondents. The first asked, "When you purchase cheese from your local grocery store, do you usually purchase blocks of cheese to shred yourself or do you usually purchase the pre-shredded variety?" Ex. 2 to Lee Decl., Dkt. 287-2 at 23. Respondents could choose between three answers: "I prefer blocks of cheese to shred myself," "I prefer pre-shredded bags of cheese," and "I purchase both." *Id.* The next question asked, "What brands of pre-shredded cheese have you purchased within the last 6 months?" *Id.* at 24. The potential answers were Lucerne, Kraft, Sargento, Daiya, Marcela, Organics, Market Pantry, O'Sullivan and Other. *Id.* Only those respondents who checked the box next to Kraft were used for the substantive survey.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

As noted, Bodapati screened out survey respondents who had not purchased Kraft shredded cheese during the prior six months. Ex. 12 to Lee Decl., Dkt. 287-12 at 22 (98:14-22). However, he did not specifically ask whether, during that time period, they had purchased the Product -- Kraft Natural Cheese Fat Free Shredded Fat Free Cheddar Cheese. *Id.* at 21-22 (97:22-98:8). In his deposition, Bodapati explained the basis for his decision on this issue:

> [T]he reason I did not check specifically for what you're saying is, as I said, the concern that you're alluding to did certainly occur to me, is that I did not have a prima facie reason to believe that the value of the natural cheese attribute, which is the entire focus of this research, for people who were included in this study, even though they did not buy Kraft natural cheese, would be different.

*Id.* at 22 (99:2-10). Thus, he concluded that asking about Kraft Natural Cheese Fat Free Shredded Fat Free Cheddar Cheese "would detract from the quality of the study in making it more arduous and would not impact the findings substantially." *Id.* (99:17-19).

Kraft argues that Bodapati's decision was in error because consumers of the Product are fundamentally different from those who purchase other Kraft cheese products. In support of this position, Kraft cites the following evidence:

- Deposition Testimony of Christopher Urban: Urban, the director of marketing at Kraft, stated that, "as a marketer thinking about the consumer behavior, the reason why someone would purchase a fat-free natural cheese product is because they probably are on some sort of health-restricted diet or they can't have either dairy fat or fat in their diet, so they would be looking specifically for fat-free products to bring into their house. The taste isn't great, the properties of in terms -- because there is no dairy fat in it, the product doesn't melt extremely well. So there is no other reason why you would buy this unless you were on some sort of fat-restricted, low-fat diet and had dietary reasons to have the fat-free cheese product." Ex. 10 to Lee Decl., Dkt. 283-7 at 5-6 (155:18-156:9). He also stated that the "primary purchase decision" for a purchaser of the Product "would be the fact that there is no fat." *Id.* at 8 (159:6-8).

- Report titled "2% Milk Research Qualitative Findings": This report, which was based on market research conducted in Chicago and Boston in 2008, includes a statement that "[m]oms that buy reduced-fat cheeses and serve them to their families often started on a 'fat free kick,' where everything they bought, including dairy, was fat-free. The intention was typically to loose [sic] weight; sacrificing taste in the process. Over time, they described 'migrating back' to a mix of full- and reduced-fat cheese and dairy products, which taste better than fat-free and, importantly, are more acceptable to other family members." Ex. 19 to Lee Decl., Dkt. 283-9 at 14.

- Report titled "2006 Naturals Situation Assessment": This report, which was produced in March 2005, stated, "[t]oday, 0g cholesterol is the key reason consumers choose FREE." Ex. 20 to Lee Decl., Dkt. 283-10 at 12.

- Report titled "Natural Shreds Category Consumer Review": This report, which analyzed data from 2008, states: "Consumers generally think of 2 health segments; regular or better-for-you

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

(healthy). A secondary distinction is made within the better-for-you segment between low fat and
no fat." Ex. 21 to Lee Decl., Dkt. 283-11 at 9 (emphasis in the original). It also states that no fat
cheese varieties "skew[] to younger, smaller, high income households." *Id.* at 23.

Based on this evidence Kraft argues that, "the Kraft Fat Free variety is a niche product catering to only a
small sliver of the public that is different from 'full fat' purchasers." Dkt. 284 at 14.

As a general rule, "courts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of
an overinclusive or underinclusive target population." *Icon Enterprises Int'l, Inc. v. Am. Prod. Co.*, No. CV
04-1240 SVW PLAX, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7, 2004) Kraft cites only two in-circuit
cases in support of its position that "[n]umerous courts" have excluded surveys of overinclusive
populations. Dkt. 284 at 15. *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014
WL 572290 (N.D. Cal. Feb. 11, 2014), considered a survey of law enforcement personnel who used
photographs at work. *Id.* at *4. The plaintiff sought to have the survey admitted to prove that the
defendant's advertising for VeriPic software, which provided digital evidence-related software to police
and fire departments, was false or deceptive. *Id.* at *1. *Kwan Software* adopted the following standard:

> To assess the validity and reliability of a survey, a court should consider a number of criteria,
> including whether: (1) the proper universe was examined and the representative sample was
> drawn from that universe; (2) the survey's methodology and execution were in accordance with
> generally accepted standards of objective procedure and statistics in the field of such surveys; (3)
> the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5)
> persons conducting the survey were recognized experts.

*Id.* at *4 (quoting *Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012)).

The court concluded that the survey was inadmissible because the majority of respondents described
themselves as "unfamiliar with the photo management software programs." *Id.* In addition, and "more
importantly," the court concluded that users of the software were not necessarily the target audience for
the advertisements at issue. *Id.* at *5. Rather, "the allegedly false statements at issue were made in
responses to requests for proposals ('RFPs'), direct emails, and displays at trade show." *Id.*

In *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866 (C.D. Cal. 2013), the plaintiff sought to have a
survey admitted to test whether his photographs were associated with the shoe brand Sketchers. *Id.* at
877. Those surveyed were men and women ages 16 to 24 in five geographic regions across the country.
*Id.* No effort was made to determine if the advertisements at issue in the action had been published in the
participants' home regions. *Id.* Thus, there was "no indication that the survey population had any
relationship to the relevant population of Skechers consumers." *Id.* at 878.

These cases are distinguishable. The pool of survey respondents here -- purchasers of Kraft shredded
cheese -- are likely to be familiar with the Product and Kraft packaging. Further, Bodapati's provides a
reasoned explanation for his decision not to limit the survey audience to purchasers of the Product.
Therefore, whether that decision would reduce the weight accorded to the survey results is an issue for
the finder of fact. *See ConAgra Foods*, 90 F. Supp. 3d at 947 (where experts disagreed on the
appropriateness of a certain methodology, "the disagreements go to the weight of the results produced by
. . . [the] methodology, not to its reliability").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

The other authority cited by Kraft is also unpersuasive. For example, *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich. 2003), concluded that the survey population was inappropriate because it tested the online behavior of contact-lens users and readers of online periodicals, but sought to be admitted in a case regarding online mortgage purchasers. *Id.* at 752-53. *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008), concluded that a population of respondents who were over age 13 and in the past year had purchased, and the upcoming year would consider purchasing, "bumper stickers, t-shirts or coffee mugs with words, symbols or designs on them. . ." was overbroad. *Id.* at 1325. The purpose of the survey was to reach a population of consumers of satirical Wal-Mart-themed merchandise sold through the website www.cafepress.com. *Id.* These populations are substantially broader and less related to the product at issue than the population surveyed by Bodapati.

Moreover, there is no requirement that the universe of those surveyed overlap entirely with the class. *See Southland*, 108 F.3d at 1143 (9th Cir. 1997) (objection that a survey tested only a subset of the class went "only to the weight, and not the admissibility, of the survey"). Indeed, if there were such a requirement, the report of Simonson, who is one of Kraft's experts, would be inadmissible because he purposefully elected not to survey California residents. *See* Ex. 2 to Clarkson Decl., Dkt. 312-2 at 4. Further, although based on the deposition testimony of Urban, Kraft argues that the primary driver of Product purchasing is fat content, the "Natural Shreds Category Consumer Review" indicates that fat content is the third most significant factor customers consider in making purchasing decisions. Ex. 21 to Lee Decl., Dkt. 283-11 at 8. The first two are: (1) usage, *i.e.,* cooking, topping, sandwich; and (2) form, *i.e.*, natural shred, natural chunks, snacking. *Id.* That review also states that "[c]onsumers buy more than one health segment for different uses, household members and taste preferences." *Id.* This undermines Kraft's argument that purchasers of the Product are distinct from those who purchase other Kraft shredded cheese products.

        b)    Damages

Kraft's next challenge to Bodapati's survey is that it is irrelevant to the claims at issue because it does not calculate proposed damages. This argument is based on the following testimony by Bodapati:

> Q. And if someone says I want to be compensated, according to your survey, response survey, of $4 or $4.50, given that the average cheese product, shredded cheese product is 3 to $4, does the compensation amount of $4 seem reasonable to you?
> . . .
> A: Which is why -- now that I see as a question of damages and that is a litigation issue and that was not what I was charged with. I was charged with the issue of determining what additional increment a person is willing to pay for that label. The results are what they are. These are what people responded.

Ex. 12 to Lee Decl., Dkt. 287-12 at 25 (162:17-163:7).

This testimony may reasonably be construed as distinguishing damages as a legal concept and the scientific calculation of the dollar value a consumer attributes to the label "natural cheese." This does not preclude the use of the survey as some evidence relevant to the calculation of damages. Elsewhere in his deposition, Bodapati testified that "[d]amages come up primarily in litigation matters. What we do center our attention on in research is value of attributes. Now, whether you take that value and use it for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|----------|--------------------------|--|------|--------------|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

damages is a different matter. But the focus of research is on value of attributes." *Id.* at 9 (48:14-19). Again, this statement distinguishes his analysis and one specifically directed to damages, but it does not state that the survey cannot be used as part of a measurement of them. That is a reasonable interpretation of his testimony that "whether you take that value and use it for damages is a different matter."

Kraft also argues that "[t]he Ninth Circuit has held that the only proper model for the calculation of damages for a false advertising claim is a 'price premium' theory." Dkt. 284 at 16-17 n.6. Thus, it argues that, as a matter of law, a conjoint analysis cannot be used. However, as another court in the Central District has noted, courts frequently admit evidence based on a conjoint analysis under *Daubert*. *Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730, at *8 (C.D. Cal. July 24, 2014) (citing *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328 at *17 (N.D. Cal. Feb. 25, 2014); *Khoday v. Symantec Corp.*, 2014 WL 1281600, at *33 (D.Minn. Mar. 13, 2014); *Microsoft Corp. v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1120 (W.D.Wash. 2012)).

Nor does this argument bear on the validity of the survey or the results, but instead challenges their application to a calculation of damages. Thus, it is more appropriate to address this aspect of Kraft's challenge in the context of the related Motion for Decertification and the Motion for Summary Judgment. Moreover, as stated in the December 2, 2016 order denying the parties' cross-motions for summary judgment, Bodapati's survey is relevant to materiality. Dkt. 271 at 22. Consequently, there is no basis to exclude it entirely.

Kraft also argues that Plaintiffs are estopped from the application of a conjoint analysis as a measure of claimed damages because they previously committed themselves to a price premium theory. This argument is based on the following statement in Plaintiffs' reply brief in support of their earlier motion for class certification: "[Plaintiffs'] theory of liability rests on the claim that, due to the inclusion of artificial color, an unnatural ingredient, in the Product, the Product's true value or market price is a figure lower than the purchase price of roughly $4." Dkt. 60 at 14. Kraft argues that this statement makes "clear that [Plaintiffs] are pursuing a "price premium" theory of damages. Dkt. 284 at 16. Consequently, it contends that there can be no "fit" between the methodology used in Bodapati's study and Plaintiffs' legal claims. *Id.* at 11-12. (citing *Gutierrez v. Wells Fargo & Co.*, No. C07-05923 WHA, 2010 WL 1233810, at *3 (N.D. Cal. Mar. 26, 2010)).

The Class Certification Order Court addressed a similar argument. That order granted certification based in part on Bodapati's original report, in which he described conjoint analysis and concluded that it was the best means to assess damages in this action. Dkt. 78 at 10. As the Class Certification Order concluded:

> Plaintiffs have presented a method for calculating damages that is tied to their theory of liability. They contend that each class member paid more for the Product because the term "natural cheese" was used to describe it. From this they argue that damages can be measured by applying the analytical methodology proffered by Bodapati, *i.e.*, the choice model theory using marketplace and conjoint experiment datasets. This dollar amount can then be multiplied by the number of units purchased by each class member to determine both total and individual damages.

*Id.* at 12.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

For these reasons, Kraft's argument that Bodapati's survey produces results that do not "fit" with the legal claims is not persuasive.

c)   Additional Challenges to Survey Methodology

Kraft advances several challenges to the design and methodology of Bodapati's survey.
Generally, "deficiencies in [a] survey's methodology are properly addressed by cross-examination at the trial rather than outright exclusion." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, No. SACV04-725CJC(EX), C, at *4 (C.D. Cal. Mar. 2, 2006); *see also Icon Enterprises Int'l, Inc. v. Am. Prod. Co.*, No. CV 04-1240 SVW PLAX, 2004 WL 5644805, at *22 (C.D. Cal. Oct. 7, 2004) ("Methodological flaws in the design or execution of the survey will go only to the weight accorded the survey by the fact finder.").

These challenges go to the weight of the evidence, rather than its admissibility. Therefore, they are not a basis to exclude Bodapati's report or testimony with respect to the present motions. The specific challenges are addressed in the following discussion.

(1)   Conjoint Analysis Cannot Be Used to Measure Only One Attribute

Defendant argues that "conjoint analysis means an analysis of features **CON**sidered **JOINT**ly." Dkt. 284 at 21 (quoting Ex. 7 to Lee Decl., Dkt. 287-7 at ¶ 16). It argues that Bodapati deviated from the generally accepted principle of testing several attributes, and instead tested only one: whether the "natural cheese" label was present. *Id.*

In support of this position, Kraft cites the rebuttal report of Simonson, in which he opined that "the selected methodology is unacceptable given the decision to compare two products with only one nonprice attribute -- the label at issue." Ex. 5 to Lee Decl., Dkt. 287-5 at ¶ 5. Simonson also stated that this type of study is "extremely unusual" and that he has never before seen one like it. *Id.* at ¶ 22. In addition, Wilcox stated that, by varying only price and the presence or absence of the "natural cheese" label, the Bodapati study focused respondents on that label, which is exactly what conjoint analysis was designed to avoid. Ex. 7 to Lee Decl., Dkt. 287-7 at ¶ 21.

Bodapati testified about these issues during his deposition. He stated that he has "done many conjoint analyses over the last 20 years. . . ." Ex 12 to Lee Decl., Dkt. 287-12 at 7 (41:7-8). He then opined that:

> [T]he key concern and everything that we worry about in conjoint analysis relates to verisimilitude and not distorting decision making. If you have a large number of attributes, what it does is you are, therefore, required to present a list of -- of long attributes in the stimuli. And a consumer may not be actually processing all those things in real life. So therefore, we -- and -- so we want -- we generally want to, again, as I said, not distort the decision making. And where we think that the -- increasing the number of attributes will not distort the decision making, we are perfectly comfortable having a large number of attributes. . . . But keep in mind that having one attribute only is good for the conjoint analysis in the sense that it reduces cognitive overloading and thereby increases the fidelity of the decision making.

*Id.* (40:1-15; 41:13-16).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

"The *Daubert* duty is to judge the reasoning used in forming an expert conclusion." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Id.* at 1231 (quoting *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). In light of the evidence presented, any dispute as to Bodapati's use of conjoint analysis goes to the weight, not the admissibility of this evidence.

(2)      The Survey Improperly Telegraphed Its Own Purpose

Defendant also argues that Bodapati failed to conduct a blind survey and instead telegraphed to respondents the purpose of the survey. Dkt. 284 at 23. In his report, Simonson states, "by focusing on just this one label or one feature, it virtually guaranteed that respondents would provide answers indicating that they needed to be compensated (with few exceptions)." Ex. 5 to Lee Decl. Dkt. 287-5 at ¶ 17. This phenomenon is known as "focalism." *Id.* at ¶ 18.

At his deposition, Bodapati explained why he was not concerned with the possibility that the survey could be affected if respondents attempted to pick the "right" answer:

> [I]n conjoint analysis, there is no right answer, so I don't know what might cause that kind of an inference. And even if that inference were made -- and I cannot think of prima facie compelling reasons why that would be the case -- the operating question is, does it change the decision making, does that distort the decision making. So one would have to make quite a well-connected argument to be able to go from the kind of situation that you're hypothesizing to it impacting the validity of the findings.

Ex. 12 to Lee Decl., Dkt. 287-12 at 5 (32:24-33:10).

This is another matter that goes to the weight, not the admissibility of the challenged evidence.

(3)      The Survey Relied on Unrealistic Assumptions

Defendant argues that Bodapati's study lacked reliability for several reasons: (i) it used unrealistic prices; (ii) it signaled to respondents that there was something wrong with the Kraft Fat Free Shredded Cheddar without the "Natural Cheese" label; (iii) respondents could not see the back of the packaging; and (iv) it did not provide respondents with the option of answering a question, "none of the above."

The second argument is based on what appears to be a misinterpretation of the sample survey attached to Bodapati's supplemental report. Thus, Defendant argues that, "[o]f the 14 sets of Kraft Fat Free Shredded Cheddar images shown to respondents, the non-'Natural Cheese' version was priced at the lower amount in 12 of them." Dkt. 284 at 27. It continues: "Critically, the prices for the non-"Natural Cheese" Fat Free Shredded Cheddar were unrealistically low: $1.64, $1.94, $2.74, $1.44, $1.74, $1.69, $1.84, $1.94, $2.39, $1.04, $1.74, $2.19, $1.34, and $1.49." *Id.* at 27-28. However, Bodapati's supplemental report states: "Each respondent is presented 14 . . . screens, with screens differing randomly in the ordering of the items and the price points." Ex. 2 to Lee Decl., Dkt. 287-2 at 9. This supports the claim that the price points assigned to the cheese images varied randomly for each

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

respondent.

Bodapati testified at his deposition as to the remaining criticisms. He stated that he selected the price points used in the survey

> because of this project I had done earlier, I had remembered the price distribution. And let me tell you what the price distribution of that, when I looked at that dataset, was. And that was a Nielsen dataset, and it was a household panel. And the prices ranged from 80 cents to $8. I -- that made a mark on me because it was a nice round tenfold order of magnitude difference. So the range of prices in that particular dataset for shredded cheese was between .80 dollars and $8. And I remember also at that time that the distribution of prices was in the 3 to $4 range because, after all, prices do vary and you have a probability distribution like a normal distribution. And the middle of the data was in the 3 to $4 range, and that was also consistent. So if you remember, I told you earlier that I just went on the website and looked at images, and at that point when I looked at it, the prices were in the $4 range.

Ex. 12 to Lee Decl., Dkt. 287-12 at 20 (90:18-91:13). He then added further support for the prices used in the survey, noting that, "according to the theory of conjoint analysis, the exact price points and distributions are not important. They just need to have verisimilitude." *Id.* at 21 (94:8-11).

He also testified that he elected not to show the back of the packaging out of a concern for verisimilitude:

> I did consider these alternatives, actually. I did consider the issue of showing the back. And you raise a good point. The reason we decided not to do that is because we felt that this was adequate to communicate. Since the overarching goal is to make sure the person understands what the product is and this information we felt . . . to communicate what the product stood for, we did not do that.

Ex. 1 to Clarkson Decl., Dkt. 312-1 at 18 (117:10-17).

When asked why he did not provide a "none of the above" option, Bodapati responded:

> If you look at the theory and the way the calculations are set up, the validity of the calculations of the attribute value sustains even without the presence of other alternatives. Specifically, it does not matter whether competing products are presented or not. So one might extend your question by asking why was Sargento not present, for example. So if we can go into the discussion of the basic assumptions that are made and why it does not matter, but the calculations -- all that they rely on is that the decision process that's being applied is reflective and that when a person evaluates a product one by one, that person is evaluating the product on its own.

Id. at 21 (135:23-136:12).

A reasonable assessment of this testimony shows that Bodapati considered all of the issues Defendant has raised in constructing and implementing the conjoint analysis process. It also shows that he made a series of decisions regarding survey design based on his professional judgment. Defendant has provided expert rebuttal opinions that criticize these decisions. Once again, these positions go the weight, not the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

admissibility of Bodapati's report and testimony.

(4)    The Process for Calculating Average Compensation Amount was Flawed

Kraft also argues that there were several "methodological errors" in Bodapati's calculation of the average compensation amount for class members. They argue that Bodapati: (i) should not have used the mean to generate his average compensation amount; (ii) failed to exclude inconsistent and irrational survey results; (iii) improperly excluded negative dollar responses; (iv) failed to calculate historical damages and consider marketplace data; and (v) used a "custom program" to calculate the compensation amount. In support of this argument, Kraft relies on the rebuttal report of Emmert.

Emmert opines that Bodapati's use of a simple average is unsupported and overstates the individual compensation amount by providing inappropriate weight to the responses of outliers. Ex. 6 to Lee Decl., Dkt. 287-6 at ¶¶ 72-74. He notes that the largest cluster of responses assigns a value in the range of zero to ten cents to the "natural cheese" label. *Id.* at ¶ 75. He also states that the median value is approximately $.32. *Id.* at ¶ 77. Emmert also suggests that, if one were to exclude compensation amounts of $2 and greater, nearly 40% of the dataset reports compensation amounts between $0 and $.10. *Id.* at ¶ 79. Therefore, Emmert opines, an appropriate compensation amount should be in that range. *Id.* at ¶ 79.

At his deposition, Bodapati testified that he used the mean "because of the way the purposes of this calculation is going to be used for." Ex. 1 to Clarkson Decl., Dkt. 312-1 at 27 (167:22-24). He noted that, although individual compensation amounts could vary, the mean "leads to an estimate of the sum of the compensation amounts." *Id.* (167:9-10). Thus, the calculation does not suggest that any individual consumer values the "natural cheese" attribute at $.747. Instead, it indicates that this figure would represent the average of damages among the Class on a per person basis.

Emmert also opines that Bodapati improperly failed to exclude inconsistent and irrational survey results. Ex. 6 to Lee Decl., Dkt. 287-6 at ¶ 33. These "results included incidents where respondents declined to purchase the Product at a certain price difference, but then subsequently indicated that they would be willing to purchase the Product at a higher price difference." *Id.* Emmert identified such answers from 25% of survey respondents. *Id.* At his deposition, Bodapati stated that "[s]ome inconsistencies may occur occasionally because of what we call operator error." Ex. 1 to Clarson Decl., Dkt. 312-1 at 31 (187:9-10). He stated that the number of inconsistencies was "small" in the pilot survey that preceded the full survey. *Id.* (187:12-15). There was no indication in his testimony that he examined the final survey results for answers in the manner identified by Emmert.

Emmert also states that "[t]he individual compensation estimates Dr. Bodapati's damages methodology produces for those respondents are negative values, such as $-1.00, $-.50, etc. When Dr. Bodapati alters these values by increasing the values to $0, he is effectively overstating the overall Compensation. . ." Ex. 6 to Lee Decl., Dkt. 287-6 at ¶ 71. Bodapati explained at his deposition that "[t]he compensation amount for the people with -- who already prefer the non-natural cheese attribute I believe should be zero. And I can make a compelling case for it, because they got the preferred product, why should they be compensated?" Ex. 1 to Clarkson Decl., Dkt. 312-1 at 25 (159:24-160:3).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

In addition, Defendant cites Emmert's opinion that "[d]amages calculations generally rely on actual customer and market data to calculate damages for a historical time period because the data reflects the actual purchasers and purchasing patterns of alleged claimants." Ex. 6 to Lee Decl., Dkt. 287-6 at ¶ 24. Emmert also opined that, "[r]eliance on experiments to measure historical damages, associated with the 'natural cheese' label, is not an acceptable methodology for calculating class-wide damages to a reasonable degree of certainty." *Id.* This is a legal conclusion, not an admissible expert opinion. Moreover, it is contradicted by persuasive district court decisions. "[U]sing current research results to draw inferences about past consumer behavior is a regular practice in litigation." *ConAgra Foods*, 90 F.Supp. 3d at 1028. *ConAgra Foods* cites to *Guido*, 2014 WL 6603730, at *10, where plaintiffs were permitted "to calculate one consumer value for a flammability warning on a product and apply it equally to purchases made over the a [sic] six year period." *ConAgra Foods*, 90 F.Supp. 3d at 1028.

Finally, Defendant has not made clear why Bodapati's use of a custom program to analyze the data disqualifies him under *Daubert*. Bodapati testified that a program called Sawtooth is widely used to conduct conjoint analyses. Ex. 12 to Lee Decl., Dkt. 287-12 at 9 (47:22-24). However, Bodapati stated that, because Sawtooth would not allow him adequate control over the price difference input, it was "suboptimal for this particular project." *Id.* at 26 (183:12-21). He then testified that, "[i]n general, when the stakes are high, I consider it very important, especially if I'm called in as an expert, to know exactly what was computed. And like a lot of commercial software, the details [in Sawtooth] are hidden." *Id.* (184:11-15). Defendant argues, "[t]his use of a custom program that is not generally accepted further casts doubt on the reliability of [Bodapati's] results." Dkt. 284 at 32. To the extent this is true, it is an issue for the factfinder.

"[T]here is no such thing as a 'perfect' survey." *Classic Foods*, 2006 WL 5187497, at *7 (quoting *Selchow & Righter Co. v. Decipher, Inc.*, 598 F.Supp. 1489 (E.D.Va.1984)). However, Kraft's criticisms, "valid as they may be, go to 'issues of methodology, survey design, reliability, . . . [and] critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010). For these reasons and those stated in the discussion of the various challenged elements of Bodapati's analysis, Defendant's objections go to the weight, not the admissibility of the challenged evidence.

### C.    Conclusion

For the reasons stated above, the Motion to Exclude is **DENIED**.

### IV.    Motion for Decertification (Dkt. 285 (redacted); Dkt. 294 (unsealed))

A.    Background

As noted, on June 23, 2015, the Class was certified ("Certification Order" (Dkt. 78)). The Certification Order addressed the requirements of Rule 23(a), and concluded that each had been met:

- Numerosity: Kraft represented that sales of the Product between May 2010 and May 2014 generated revenues of approximately $4.7 million. Dkt. 78 at 3. Based on an average retail price

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

of approximately $3.89, this reflects approximately 1.2 million sales to consumers. *Id.* Thus, the Court concluded that the numerosity requirement is satisfied. *Id.*

- Commonality: There are two primary questions at issue in the action. "First, whether the use of the term 'natural cheese' would mislead a reasonable consumer. Second, whether Kraft knew or should have known that its labeling of the Product was misleading." The Court concluded that these questions satisfy the commonality requirement. *Id.*

- Typicality: "[E]ach of the named Plaintiffs alleges that she purchased the Product based on the understanding that arose from the label 'natural cheese.' Thus, each believed that meant the Product did not contain artificial ingredients, including artificial coloring." *Id.* The Court concluded that these claims are sufficiently typical of the claims of the class. *Id. at 5.*

- Adequacy: The Court found "no evidence that Plaintiffs have a conflict of interest as to any other class member. Nor is there any evidence that Plaintiffs' counsel will not prosecute the action vigorously on behalf of the proposed class." *Id.* Thus, the Court concluded that the adequacy requirement had been satisfied. *Id.*

The Certification Order also concluded that the requirements of Rule 23(b)(3) had been met as to both liability and damages. As to liability, it stated that predominance had been shown under the UCL and the FAL. *Id.* at 7. This is because whether it is likely that a reasonable consumer would be confused by the term "natural cheese" is amenable to resolution on a class-wide basis. *Id.* It also concluded that predominance had been shown under the CLRA because the question whether a reasonable person would rely on, and consider significant, the use of the term "'natural cheese,' is amenable to resolution on a class-wide basis." *Id.* at 8.

As to damages, the Certification Order provided:

Plaintiffs have demonstrated that damages may be calculated on a class-wide basis. As explained in *Levya*, issues as to damages calculations do not bar class certification. Further, as required by *Comcast*, Plaintiffs have presented a method for calculating damages that is tied to their theory of liability. They contend that each class member paid more for the Product because the term "natural cheese" was used to describe it. From this they argue that damages can be measured by applying the analytical methodology proffered by Bodapati, *i.e.*, the choice model theory using marketplace and conjoint experiment datasets. This dollar amount can then be multiplied by the number of units purchased by each class member to determine both total and individual damages. Further, even if individual issues as to damages arise at a later time, the case may be tried in two phases: liability and damages. *Jimenez*, 765 F.3d at 1168.

*Id.* at 11-12. The Order also determined that members of the Class could be ascertained through self-identification presented in sworn statements. *Id.* at 15.

As noted earlier, the Class is defined as: "All persons who, between May 7, 2010 through the present, purchased the Product in the State of California for personal use and not for resale and who did so

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

because the Product was described as 'natural cheese,' which meant that it contained no artificial ingredients." *Id.*

Kraft filed a Rule 23(f) petition for leave to seek an interlocutory appeal of the Class Certification Order. Dkt. 82. The case was stayed during the pendency of the petition. Dkt. 84. The Ninth Circuit denied the petition. The stay was lifted on September 30, 2015. Dkt. 86.

**B.    Analysis**

1.    Legal Standards

With respect to a motion for decertification, "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." *Ridgeway v. Wal- Mart Stores, Inc.*, No. 08-cv-05221-SI, 2016 WL 4529430, at *12 (N.D. Cal. Aug. 30, 2016). However, "[p]arties should be able to rely on a certification order and 'in the normal course of events it will not be altered except for good cause,' such as 'discovery of new facts or changes in the parties or in the substantive or procedural law.'" *Ramirez v. Trans Union, LLC,* No. 12-cv-00632, 2016 WL 6070490, at *2 (N.D. Cal. Oct. 17, 2016) (citing *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 409-10 (C.D. Cal. 2000)).

"The party seeking decertification bears the burden of demonstrating that the elements of Rule 23 have not been established." *Cole v. CRST, Inc.*, 317 F.R.D. 141, 144 (C.D. Cal. 2016) (citing *Weigele v. FedEx Ground Package Sys.,* 267 F.R.D. 614, 617 (S.D.Cal. 2010)); *Rosales v. El Rancho Farms, No. 09-cv-00707*, 2014 WL 321159, at *4 (E.D.Cal. Jan. 29, 2014) ("This burden 'is relatively heavy' since any 'doubts regarding the propriety should be resolved in favor of certification'") (quoting *Slaven v. BP America, Inc.*, 190 F.R.D. 649, 651 (C.D.Cal. 2000)). The Court may consider evidence which goes to the requirements of Rule 23, but should not weigh competing evidence. *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003).

Finally, as stated in the Certification Order, "'damages calculations alone cannot defeat certification,' even if individual issues predominate." Dkt. 78 at 8-9 (quoting *Leyva v. Medline Indus.* Inc., 716 F.3d 510, 513 (9th Cir. 2013)).

2.    Application

a)    Plaintiffs' Method for Calculating Restitution

In connection with the Motion for Decertification, Kraft makes several challenges to Plaintiffs' "method for calculating classwide damages." Dkt. 294 at 13-20. As an initial matter, Plaintiffs here are not seeking "damages" as that term is used in connection with other legal claims, *e.g.,* tort and breach of contract claims. Instead, the claims here arise from the UCL and the FAL. Neither of these statutes provides for an award of "actual damages." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 695 (2006). Rather, they provide for restitution, which is also called, "restitutionary damages." *Id.* Such restitution is an equitable remedy. Therefore, decisions about the scope of its application are for the court, not a jury,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

to decide. *Id.*; *see also* Cal. Bus. & Prof. Code § 17203 ("The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."); Cal. Bus. & Prof. Code § 17535 ("The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful.").

The CLRA provides for both damages and equitable relief. *See* Cal. Civ. Code § 1780(a)(1) and (3) (providing that "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against that person to recover or obtain any of the following: (1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000). . . . (3) Restitution of property."). The restitutionary remedies available under the UCL and the FAL "are identical and are construed in the same manner." *Colgan*, 135 Cal. App. 4th at 695. (quoting *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 177 n.10 (2000)). *Colgan* observed that the restitutionary remedy under the CLRA should be interpreted in the same manner. *Id.*

The SAC does not include an express request for "actual damages" as defined in the CLRA. Rather, it seeks "restitutionary damages." SAC, Dkt. 40. The SAC also requests an Order "enjoining Defendants from pursuing the policies, acts, and practices complained of herein and requiring Defendant[ ] to pay restitution to Plaintiffs and all members of the Class." *Id.*

(1)     Requirements of *Comcast*

As noted in the earlier discussion of the Motion to Exclude, Kraft argues that Plaintiffs have failed to offer a valid method for calculating classwide damages as required by *Comcast v. Behrend*, 133 S. Ct. 1426, 1433 (2013).[2] The Class Certification Order addressed the *Comcast* standard:

> Where damages are sought on a class-wide basis, it must be shown that their calculation is subject to common proof. *Comcast*[], 133 S. Ct. [at 1433]. Such calculations "need not be exact." *Id.* However, at the class-certification stage, "any model supporting a plaintiff's damages case must be consistent with its liability case . . . [and] courts must conduct a rigorous analysis to determine whether that is so." *Id.* at 1433 (internal quotation marks omitted). However, "damages calculations alone cannot defeat certification." *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). Indeed, even if individual issues predominate on damages calculations, that alone cannot defeat certification. *See id.*; *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089, 1094 (9th Cir.

---

[2] *Comcast* involved violations of the Sherman Act, 15 U.S.C. § 1 *et seq. Behrend v. Comcast Corp.*, 264 F.R.D. 150, 156 (E.D. Pa. 2010). That statute requires a showing of "measurable damages." *Id.* The Ninth Circuit has applied *Comcast* in the context of restitutionary damages. *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

2010).

Dkt. 78 at 8-9 (footnote omitted).

In *Comcast*, the plaintiffs advanced four theories of antitrust liability. *Comcast*, 133 S. Ct. at 1430. They argued that Comcast's practice of "clustering," *i.e.,* concentrating operations within a particular region, had four separate effects. *Id.* These were: (i) clustering made it profitable for Comcast to withhold local sports programming from its competitors, undermining direct broadcast satellite providers; (ii) Comcast's activities reduced the level of competition from "overbuilders," which are companies that build competing cable networks; (iii) Comcast reduced the level of benchmark competition; and (iv) clustering increased Comcast's bargaining power relative to that of content providers. *Id.* at 1430-31. The district court accepted only the overbuilder theory of liability. *Id.* at 1431. However, the damages model at issue did not distinguish among the claimed effect of any of the four theories of liability. *Id.* The Supreme Court concluded that the damages model in *Comcast* was unable "to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding." *Id.* at 1435. Thus, it could not form the basis for certifying the overbuilding class under Rule 23(b)(3).

The present action is distinguishable from *Comcast*. Here, there is a single overarching theory of liability: the "natural cheese" label on the Product misled consumers, causing them to pay more for the product on which it appeared. Bodapati designed his study in an attempt to calculate only the value to consumers of what is stated on that label. Indeed, Defendant has objected to study because it failed to identify other variables. In light of these circumstances, a helpful analysis is provided by *In re POM Wonderful LLC*, No. ML 10-02199 DDP RZX, 2014 WL 1225184, (C.D. Cal. Mar. 25, 2014). As that court explained, "*Comcast* holds that, under rigorous analysis, 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Id.* at *2 (quoting *Leyva*, 716 F.3d at 514); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015) ("The putative class's problem in Comcast was that the damages model 'did not isolate damages resulting from any one theory of antitrust impact.'") (quoting *Leyva*, 716 F.3d at 514).

Putting aside the Defendant's criticism of the Bodapati study, it offers evidence as to the value of the "natural cheese" label, *i.e.*, damages, which are linked to whether the content of that label was false or misleading, *i.e.*, the theory of liability. *See* Dkt. 78 at 12 ("[A]s required by *Comcast*, Plaintiffs have presented a method for calculating damages that is tied to their theory of liability. They contend that each class member paid more for the Product because the term 'natural cheese' was used to describe it. From this they argue that damages can be measured by applying the analytical methodology proffered by Bodapati, *i.e.*, the choice model theory using marketplace and conjoint experiment datasets."). Thus, the damages model offered by Plaintiffs is not barred by *Comcast*. Even if Bodapati's calculations did not correctly quantify Plaintiffs' *harm*, they are not inconsistent with the proffered theory of *liability*.

Defendant also argues that *Comcast* requires a court to consider whether a proposed damages method permits "measurement across the entire class for purposes of Rule 23(b)(3)." Dkt. 294 at 13. However, Comcast acknowledged that "[c]alculations need not be exact." *Comcast*, 133 S. Ct. at 1433. The Ninth Circuit applied *Comcast* in *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013), where it concluded that "unlike in *Comcast*, if putative class members prove [the defendant's] liability, damages will be calculated based on the wages each employee lost due to [the defendant's] unlawful practices." *Leyva*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

716 F.3d at 510. at 514. The court noted that if an individualized inquiry into damages were held to preclude class certification, it would effectively "sound the death-knell of the class action device." *Id.* (quoting *Brinker Rest. Corp. v. Superior Court*, 53 Cal.4th 1004, 1054 (2012)). Thus, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Id.*

(2)  Requisite Measure of Damages

Kraft also argues that the results of Bodapati's study cannot be used to calculate restitution because he did not determine the price premium that Kraft charged for the "natural cheese" label, but rather "measured consumers' subjective willingness to pay, an academic and irrelevant exercise that is not consistent with Plaintiffs' theory of liability." Dkt. 297 at 8-9. Kraft argues that the Ninth Circuit had concluded that the "price premium" theory is the "only proper damages model in [a] false advertising case." *Id.* at 16-17 n.6. Whether there is a relationship between a willingness to pay and a price premium was the topic of the May 15, 2017 evidentiary hearing.

The starting point of the analysis of this issue is to define the term "price premium" as used by Kraft. Bodapati testified at his deposition that "[p]rice premium in marketing, and especially among marketing academics, since we agonize over nuances of terms, price premium means many things to many different people." Ex. 12 to Lee Decl., Dkt. 287-12 at 7 (38:4-7). Kraft uses the term "price premium" to refer to "the difference between the market price actually paid by consumers [for Kraft Fat Free Shredded Cheddar] and the true market price that reflects the impact of the ['natural cheese' label]." Dkt. 297 at 17 n.6 (quoting *In re NJOY, Inc. Consumer Class Action Litig.* ("*NJOY II*"), No. 14-428, 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016)).

Kraft cites *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531 (9th Cir. Sep. 30, 2016) to support its position that such a measurement of price premium is the only method that is acceptable to determine restitutionary damages for false advertising in the Ninth Circuit. *Brazil* held that "[t]he district court correctly limited damages to the difference between the prices customers paid and the value of the fruit they bought -- in other words, the 'price premium' attributable to Dole's 'All Natural Fruit' labels." *Id.* at 534. *Brazil* cites *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009), which held that "a proper measure of restitution" is the "difference between what the plaintiff plaid and the value of what the plaintiff received." *Id.* at 131. Because *Brazil* is unpublished, it is non-binding. Further, it is not clear that *Brazil* interpreted "price premium" or applied it in the way Defendant has proposed in this action. Plaintiffs have not stated that restitution should be something other than the difference between the price consumers paid for the Product and the value of the product received. Rather, the parties dispute how value should be calculated. *Brazil* did not address that issue.

Several district courts have considered how to calculate restitution in a product mislabeling case. In *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014), the court held that restitution in false advertising cases is properly calculated by "taking the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Id.* at *8. In *In re NJOY, Inc. Consumer Class Action Litig.* ("*NJOY I*"), 120 F. Supp. 3d 1050 (C.D. Cal. 2015), the court applied this standard and found conjoint analysis inadequate to calculate damages under the UCL and CLRA. *Id.* at 1119. Thus, it declined to certify a class of consumers who had purchased e-cigarettes whose packaging and marketing materials misrepresented information about certain health risks. *Id.*; see also *Apple, Inc. v.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

*Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014) (conjoint analysis could not be used to show a causal nexus between a particular characteristic and consumer demand because it "measures only demand for the patented features" in the fictional market created by the study and "does not account for supply at all, much less the real-world intersection of market demand and market supply, which sets the real-world market price for the devices"); *Lanovaz v. Twinings N. Am., Inc.*, No. C-12-02646-RMW, 2014 WL 1652338, at *6 (N.D. Cal. Apr. 24, 2014) (the proper measure of restitution is "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices").

Similarly, *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014), denied certification of a proposed class of consumers who had purchased an antidepressant with a label that allegedly misstated the risk to users of withdrawal symptoms. *Id.* The plaintiffs there had asserted that damages could be calculated by determining the subjective lost value to each consumer from purchasing a product that was less valuable than was expected due to its labelling. *Id.* at *4. This lost value was to be calculated using conjoint analysis. *Id.* The court concluded that conjoint analysis was inappropriate:

> [The] model looks only to the demand side of the market equation. By looking only to consumer demand while ignoring supply, Dr. Hay's method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants. The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (*i.e.*, what could be called sellers' willingness to sell).

*Id.* at *5. *Saavedra* added that, because the prescription drug market was heavily regulated, it was not an efficient market. *Id.* Therefore, it was not one in which the price paid by consumers would be expected to provide a basis for an approximation of the value they subjectively attributed to the product. *Id.*

Although these cases provide varying levels of support for Defendant's position, numerous federal courts have certified classes in false advertising and other cases where the plaintiffs used conjoint analyses to calculate damages or restitution. *Guido* held that a proposed conjoint analysis was an appropriate method for determining whether a premium was paid for product with an allegedly deficient warning about flammability and granted class certification. *Guido*, 2014 WL 6603730, at *11-12;[3] *see also In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *16 (N.D. Cal. Sept. 14, 2016) (conjoint analysis "will allow the fact finder to calculate the diminution in value of Plaintiffs' vehicles" as a result of a faulty "infotainment" system); *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-CV-01735-H-RBB, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2016) ("[A] conjoint analysis is a generally accepted method for valuing the individual characteristics of a product.").

*In re: Lenovo Adware Litig.*, No. 15-MD-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016), relied on a conjoint analysis model of damages in certifying a class of purchasers of Lenovo laptops that allegedly contained faulty software. It distinguished *NJOY* and *Saavedra* because the expert in *Lenovo*

---

[3] *NJOY I* distinguished *Guido* on three grounds: (i) the defendant had not raised concerns regarding market supply; (ii) the conjoint analysis considered many factors, and (iii) the expert in Guido stated that he would "account for '[a]ll other factors influencing value.'" *NJOY I*, 120 F. Supp. 3d at 1121.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

"consulted pricing of the Lenovo models at issue, as well as comparable PC laptops" to ensure that the results would "reflect the market." *Id.* at *21. The expert also "addressed 'the supply side' of the market, determining that it was not at issue 'because all sales of the laptop models at issue have occurred in the past.'" *Id.*

*ConAgra* observed that "[m]arketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences." *ConAgra*, 90 F. Supp. 3d at 1026; *see also Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) ("[N]umerous courts, including this one, have accepted both [Choice-Based Conjoint Analysis] and [Contingent Valuation Method] as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions."). *ConAgra* held that translating the relative importance of the attribute at issue into a price premium is permitted to calculate damages. *Id.* However, *NJOY I* distinguished *ConAgra* as having approved "the use of conjoint analysis *in conjunction with* a proposed hedonic regression that accounted for 'supply and market factors.'" *NJOY I*, 120 F. Supp. 3d at 1121 (emphasis in the original).

It is uncontested here that the conjoint analysis conducted by Bodapati did not measure the market value of the Product either with the "natural cheese" label or without it. Rather, his analysis measured how much consumers value that label. Thus, the question is whether consumer willingness-to-pay is an appropriate means to measure the amount of restitution that could be awarded.

A consideration of California law on this issue is helpful. The discretion of courts to award restitution under the UCL, FAL and CLRA "is very broad." *Colgan*, 135 Cal. App. 4th at 695 (quoting *Cortez*, 23 Cal. 4th at 177). Generally, "[r]estitution is 'the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015).

Further, the purpose of restitution is not limited to "returning to the plaintiff monies in which he or she has an interest . . . ." *Colgan*, 135 Cal. App. 4th at 695. Restitution may also serve to deter[] the offender from future violations." *Id.* at 698. However, the overarching "object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.* at 697 (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003)). Thus, it "operates only to return to a person those *measurable amounts* which are *wrongfully taken* by means of an unfair business practice. *Id.* at 698 (emphasis in the original). *Colgan* confirmed that an award of restitution must be supported by "substantial evidence." *Id.* at 700. It noted, however, that a trial court "could, when assessing *damages* under the CLRA, apply standards different from those the trial court might use when ordering *restitution* under the False Advertising or Unfair Competition Laws." *Id.* at 696.

The Ninth Circuit applied *Colgan* in *Pulaski & Middleman*. The restitution there was defined as "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received." *Pulaski & Middleman*, 802 F.3d at 988 (quoting *Cortez*, 23 Cal. 4th at 174). *Pulaski & Middleman* continued:

> Where a defendant has wrongfully obtained a plaintiff's property, "the measure of recovery for the benefit received . . . is the value of the property at the time of its improper acquisition . . . or a higher value if this is required to avoid injustice" where the property has changed in value.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

[*Colgan*, 135 Cal. App. 4th at 698] (quoting the Restatement of Restitution). Where plaintiffs are "deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately." [*Kwikset Corp. v. Superior Court,* 51 Cal. 4th 310, 329 (2011)] (emphasis in original). As the California Supreme Court explained while discussing economic harm in the context of standing, this measure "is the same whether or not a court might objectively view the products as functionally equivalent. [*Id.*]"

802 F.3d at 988-89.

The court then concluded that "UCL and FAL restitution is based on what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Id.* at 989; *see also id.* ("the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information").

These passages show that *Pulaski & Middleman* suggests that a willingness-to-pay is an appropriate means to measure restitution damages that may be awarded for false advertising. However, in *Kwikset*, the California Supreme Court held:

> Restitution under section 17203 is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.

*Kwikset*, 51 Cal. 4th at 336.

*Kwikset* added that "economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses." *Id.* Under those circumstances, plaintiffs could "seek an injunction against the offending business practice even in the absence of any basis for restitution." *Id.*

Here, both parties agree that the conjoint analysis does not provide any insight into the money received by the Defendant in connection with the sale of the Product. Rather, it bears only on the claimed loss to Plaintiffs. Thus, the evidence provided by Plaintiffs about their potential willingness to pay a premium due to the use of the "natural cheese" label is insufficient to establish a basis for calculating restitution.

This does not preclude injunctive relief pursuant to *Kwikset*. That decision made clear that mislabeling is a harm under the false advertising laws even if "the marketplace would continue to value the product as highly as the amount the consumer paid for it, whether or not he or she would do so." *Id.* at 333. *Kwikset* then explained:

> From the original purchasing decision we know the consumer valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

to part with more money than he or she otherwise would have been *willing to expend*, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the *extra money paid*, is economic injury and affords the consumer standing to sue.

*Id.* at 330 (emphasis added). "Were we to conclude otherwise, we would bring to an end private consumer enforcement of bans on many label misrepresentations . . . ." *Id.*

For the foregoing reasons, Defendants' Motion for Decertification is **GRANTED** as to the Rule 23(b)(3) Class. As explained below, supplemental briefing is required as to whether the Class should be re-certified under Rule 23(b)(2).

      b)      Manageability of the Proposed Class

Kraft also argues that the Class is unmanageable for two reasons. *First*, there is no objective method to determine the members of the Class. *Second,* this is an impermissible "fail-safe" Class. Kraft also argues that if a trial is conducted with respect to the Class as presently defined, its due process rights would be violated because there is no objective way to ensure that it is not required to pay more than its aggregate liability. Dkt. 294 at 27. To support his position, Kraft notes that the Class is limited to consumers who purchased the Product "because [it] was described as 'natural cheese,' which meant that it contained no artificial ingredients. See Dkt. 78 at 15. It argues that Class membership is, therefore, based on the subjective reasons of members for purchasing the Product. Not only would this present a risk of an excessive award, but it also shows that the superiority requirement of Rule 23(b)(3) is not met. Dkt. 294 at 20.

The Class Certification Order recognized that:

"Although there is no explicit requirement concerning the class definition in [Fed. R. Civ. P.] 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed.'" *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D.Cal.1999). To meet this requirement, a class must be defined "by reference to objective criteria." *Algarin v. Maybelline*, 300 F.R.D. 444, 454 (S.D. Cal. 2014). And, it must be "administratively feasible for the court to ascertain whether an individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).

Dkt. 78 at 12. After examining the legal standards for certification under Rule 23(b)(3), the Class Certification Order held:

The Ninth Circuit has not adopted an ascertainability standard. Nor has it determined whether self-identification is an acceptable means of establishing class membership. Given the modest retail price of the Product, common sense dictates the view that it is likely that many who purchased it did not receive receipts, and that those who did have not retained them. The same logic applies to many other retail products. Of course, some consumers may have retained purchase records, perhaps because they were budgeting or were keeping track of expenses for tax purposes. Others may have participated in rewards programs of retailers that may have tracked their purchases of the Product. But, putting aside these potential means of establishing or confirming membership in the Class, for several reasons, self-identification through sworn

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|----------|---------------------------|------|---------------|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

statements makes sense in this case.

*Id.* at 14-15. The Order added that, "absent this approach, a class proceeding would not be available in this consumer class action." *Id.* at 15. Further, it noted that "a sworn statement, made under penalty of perjury, has some inherent reliability." *Id.*

It is also significant that the Class Certification Order observed that:

> [F]or Plaintiffs to succeed on the merits in this action -- which would precede any notice to class members inviting the submission of claims -- among other things, they must have shown, by a preponderance of the evidence: (1) a reasonable consumer would have been misled by the term "natural cheese" (the § 17200 claim); or (2) marketing the Product as "natural cheese" was a material misrepresentation (the CLRA claim). To have prevailed on either, Plaintiffs will have offered proof that applies across the class, *i.e.*, common proof.

*Id.*[4]

Applying these principles, the Class Certification Order concluded that "Plaintiffs have standing on behalf of the class as defined, *i.e.*, all who purchased the Product." *Id.* (citing *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011); *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 337 (2011); *In re Tobacco II Cases*, 46 Cal. 4th 298, 324 (2009)). However, it stated that only those members of the Class who suffered injury would be able to recover damages. *Id.* (citing Cal. Bus. & Prof. Code § 17203; Cal. Civ. Code § 1780). "Accordingly, the Class [is] limited to those consumers that were misled by Kraft's use of the term 'natural cheese,' and made purchasing decisions due to that deception and not for other reasons." *Id.*

In light of these prior holdings, in order to prevail on the issue of liability, Plaintiffs must show that the "reasonable consumer" is likely to be deceived and that the misrepresentation was material. Contrary to Defendant's characterization of the Class Certification Order, liability is not contingent on Plaintiffs' ability to prove the deception of, or materiality to, every member of the Class. The limitation on membership in the Class will arise only if the remedy stage is reached. For the reasons stated above, the Class is decertified as to remedies. Therefore, Defendants' argument no longer applies.

c)      Adequacy of Class Counsel

---

[4]  These legal standards were repeated in detail in the December 2, 2016 Order on Kraft's First Motion for Summary Judgment. The UCL, FAL, and CLRA are governed by the "reasonable consumer" test. Dkt. 271 at 6. "Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Id.* (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002)). Moreover, under the CLRA, a consumer must show "that the alleged misrepresentation would have been *material* to reasonable persons." *Id.* at 6-7 (quoting *Jones v. ConAgra Foods, Inc.*, No. 12-01633, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (emphasis in original)). With respect to the CLRA, "a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance." *Id.* at 7 (quoting *Ogden v. Bumble Bee Foods, LLC*, No. 5:12-CV-01828-LHK, 2014 WL 27527, at *7 (N.D. Cal. Jan. 2, 2014)). "However, in a class action case, the reliance requirement applies only to named plaintiffs, and not to all class members." *Id.* at 8 (quoting *Tobacco II*, 46 Cal. 4th at 324).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | | Date | June 9, 2017 |
|---|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | | |

Finally, Defendant argues that counsel for the Class are inadequate. Kraft states that when the Class was certified, Plaintiffs were represented by Milstein Adelman. Dkt. 294 at 28. At the present time, the Clarkson Law Firm is sole counsel to the Class. *Id.* at 29. Kraft argues that Plaintiffs have not provided any evidence of the qualifications of the Clarkson Law Firm. *Id.* Further, Kraft argues that Plaintiff's counsel "has been dilatory and has failed to prosecute this action adequately." *Id.* (quoting *Ries v. Arizona Beverages USA LLC*, No. 10-01139 RS, 2013 WL 1287416, at *9 (N.D. Cal. Mar. 28, 2013)).

This case is markedly different from the cases cited by Defendant in support of its position as to the inadequacy of counsel. In *Ries*, for example, the plaintiffs did not introduce "*any* evidence" in support of their theory that high-fructose corn syrup and citric acid were artificial, or "any evidence from which damages may be assessed." *Ries*, 2013 WL 1287416, at *4. In *Buckland v. Maxim Healthcare Servs., Inc.*, No. CV 11-8414-JST JEMX, 2012 WL 3705263 (C.D. Cal. Aug. 27, 2012), one of the named plaintiffs died in August, 2011, class counsel learned of her death in December 2011, but had not identified, and amended the complaint to include, a new plaintiff as of May 2012. *Id.* at *6. Further, counsel in *Buckland* did not conduct any discovery as to the claims of one proposed subclass and, for another, "not only copied the theory" of another action, "but rel[ied] entirely on the evidence" gathered in that action to support their claims. *Id.*; *see also Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634 (C.D. Cal. 2010) ("Counsel has failed to give proper CLRA notice, improvidently failed to serve and agreed to dismiss a key defendant, failed to consider the important standing problems faced by the named Plaintiffs . . . , and failed to follow the Court's local rules, standing order, and instructions.) (internal citations omitted)); *Niemeyer v. Williams*, 910 F. Supp. 2d 1116, 1133 (C.D. Ill. 2012) (counsel repeatedly referenced claims that had already been dismissed, did not undertake any written discovery, re-filed large portions of a motion for class certification that had been denied a year prior, and showed "problems with meeting deadlines, frequently needing extensions and delaying proceedings.").

Here, Plaintiffs obtained certification of the Class (Dkt. 78) and successfully opposed a motion to dismiss (Dkt. 271). Kraft argues that Plaintiffs' counsel was not diligent in submitting the reports from Bodapati. Although this delay was not commendable, it did not cause undue prejudice to members of the Class. Kraft's remaining criticisms primarily involve speculation as to the basis for certain strategic decisions made by counsel for the Class. This is not a sufficient basis to show that counsel for the Class is not adequate.

### C.    Conclusion

For the foregoing reasons, the Motion for Decertification is **GRANTED**. The parties shall present briefing as to whether the Class should be recertified under Rule 23(b)(2) as a Class seeking only injunctive relief.

### V.    <u>Motion for Summary Judgment (Dkt. 286 (redacted); Dkt. 295 (unsealed))</u>

This is Kraft's second Motion for Summary Judgment. As noted above, both Plaintiffs and Kraft have previously filed Motions for Summary Judgment, which were denied in an Order issued on December 2, 2016. Dkt. 271. That Order identified three central, triable issues of fact: (i) whether the reasonable consumer is likely to view the term "natural cheese" to mean that no artificial coloring has been added; (ii) whether that belief is material to the purchasing decisions of such consumers; and (iii) whether all artificial colors, regardless of source, are artificial ingredients. *Id.* at 25.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

Kraft now argues that summary judgment should be granted on damages and on Plaintiffs' claim under
the CLRA. The basis for its position is that Bodapati's report is inadequate and inadmissible. Dkt. 286 at
5. Defendant repeats the arguments made in the Motion to Exclude regarding the purported fatal flaws in
Bodapati's survey. *Id.* It also repeats the arguments presented in the Motion to Exclude and the Motion
for Decertification regarding the use of a conjoint analysis to prove damages. *Id.* at 7.

For the reasons stated above, Plaintiffs have not provided adequate evidence to support their request for
restitution. Therefore, because there is no admissible evidence as to the amount of claimed restitutionary
damages, the Motion for Summary Judgment is granted as to that issue. This applies to the request for
restitution as to all of Plaintiffs' claims.

In contrast, the Motion for Summary Judgment is denied as to the CLRA claims. For the reasons stated
above, Bodapati's report and testimony are admissible. As stated earlier, this evidence is sufficient to
show a triable issue as to materiality under the CLRA:

> Although Bodapati's report concerns damages, it also offers opinions about materiality. A
> representation is material "if a reasonable man would attach importance to its existence or
> nonexistence in determining his choice of action in the transaction in question." *In re Steroid
> Hormone Prod. Cases*, 181 Cal.App. 4th at 156-57 (internal citation and quotation marks omitted).
> If, as Bodapati's study concluded, the average consumer would pay 75 cents more for a bag of
> the Product with the label "natural cheese", then that label plays a role in determining his decision
> when purchasing cheese. *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d
> 1050, 1088 (C.D. Cal. 2015) ("To have UCL and CLRA standing, [the plaintiff] must have
> purchased a product he would not otherwise have purchased, or paid a price premium for the
> product, in reliance on [the defendant's] misrepresentations."); *see also Manchouck v. Mondelez
> Int'l Inc.*, No. 13-cv-2148-WHA, 2013 WL 5400285, *2 (N.D. Cal. Sept. 26, 2013) (plaintiff had
> standing where he claimed to have "paid a 'price premium' because the product claimed to be
> 'made with real fruit,'" and stated that he "would not have purchased the two products at that price
> point absent the alleged misstatements").

Dkt. 271 at 22-23.

No additional information has been presented that warrants a reconsideration of this decision. *See* Local
Rule 7-18 (limiting a motion for reconsideration to the following grounds: (a) a material difference in fact
or law that reasonably could not have been known at the time of the original decision, or (b) the
emergence of new material facts or a change of law, or (c) a manifest showing of a failure to consider
material facts presented to the Court). The conclusion reached in the Order on the Motion to Dismiss is
confirmed by *Kwikset*, which is discussed above. As that opinion explained in the context of the FAL and
the UCL, "[f]rom the original purchasing decision we know the consumer valued the product as labeled
more than the money he or she parted with . . . ." *Kwikset*, 51 Cal. 4th at 330. Based on Bodapati's study
a genuine issue of material fact is presented as to whether "the consumer valued the money he or she
parted with more than the product as it actually is." *Id.* "[A]nd from the combination we know that because
of the misrepresentation [a triable issue is presented as to whether] the consumer . . . was made to part
with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer
paid more than he or she actually valued the product." *Id.* Applying these principles to materiality under
the CLRA, Bodapati's study provides evidence that a reasonable person "would attach importance to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-04387 JAK (PJWx) | Date | June 9, 2017 |
|---|---|---|---|
| Title | Claudia Morales, et al. v. Kraft Foods Group, Inc., et al. | | |

[the] existence or nonexistence" of the "natural cheese" label "in determining his choice of action in the transaction in question." *In re Steroid Hormone Prod. Cases*, 181 Cal.App. 4th at 156-57.

For the foregoing reasons, triable issues of fact have been presented as to the CLRA claim, but not as to monetary damages. Therefore, the Motion for Summary Judgment is **GRANTED** as to damages and **DENIED** as to the CLRA claims.

**VI.    Conclusion**

Defendant's Motion to Exclude (Dkts. 284, 297) is **DENIED**. The Motion for Decertification (Dkts. 285, 294) is **GRANTED**. Plaintiffs shall file a brief not to exceed ten pages on or before June 16, 2017, setting forth their position as to whether the Class should be recertified as one seeking injunctive relief under Rule 23(b)(2). Defendants shall file any opposition, not to exceed ten pages, on or before June 23, 2017. The Motion for Summary Judgment (Dkts. 286, 295) is **GRANTED IN PART**. Summary judgment is granted as to damages, but not as to the CLRA claims.

**IT IS SO ORDERED.**